Clarence A. METER, Regional Director of the Eighteenth Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

GENERAL DRIVERS LOCAL 120, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Respondent.

No. 3–71 Civ. 172.

United States District Court,
D. Minnesota,
Third Division.
July 20, 1971.

Charles J. Frisch, Minneapolis, Minn., for the National Labor Relations Board.

Robins, Davis & Lyons, by Thomas C. Kayser, St. Paul, Minn., for respondent.

NEVILLE, District Judge.

Confronting the court is a factual situation concerning which neither party has been able to cite the court any decided precedent. Petitioner claims an unfair labor practice in the form of what is called a secondary boycott. Respondent denies the same.

J. A. Danens & Sons, Inc., a Minnesota corporation (Danens), is engaged in the business of excavating and haul-

ing dirt and earth. It entered into a contract with the State of Minnesota to move some 184,000 cubic yards of earth for use in the construction of an abutment to an interstate bridge over the St. Croix River at Hudson, Wisconsin, and to become part of an interstate highway. The total contract price for material and services is $213,464, to be paid for in part by federal funds.

To procure the earth or "borrow" as it is called, Danens entered into a contract with Cemstone Products Company, a Minnesota corporation (Cemstone), admittedly purchasing from, and selling to, out of state sources in sufficient volume to be subject to the provisions of the National Labor Relations Act (Act). Cemstone engages principally in the mining and sale of sand and gravel, road building material known as "aggregate", and operates a substantial ready-mix cement business. It owns approximately 400 acres bordering on and at the northwest corner of the intersection of two principal highways. The contract envisions that Danens is to take virgin ground from an oblong tract along the east end of this acreage using heavy equipment known as "scrapers" which carry as much as 35 yards of "borrow" at a time. The sale price to be paid Cemstone is 15¢ a yard. In April 1971 the Minnesota State Highway Department surveyed, cross-sectioned and staked the tract from which Cemstone was to sell the "borrow". The area involved is on the rim of a sizeable pit at points some 70 feet or more in depth and in which Cemstone has its operations at the pit bottom and wherein are located buildings, cranes and other equipment. Testimony was that Cemstone anticipates a total revenue to it from Danens of between $20,-000 to $30,000, to be paid after the Highway Department has paid Danens. Danens is expected to complete the removal work within 45 working days. Cemstone's vice president testified that under the local Village ordinance and apparently also under some agreement with the Village, Cemstone is required ultimately to slope the area from which the

"borrow" is to be taken and that if the contract had not been made with Danens, someday Cemstone might even have had to pay or at least incur expense itself to secure a removal of this earth so as to be able to meet the sloping requirements. The court is satisfied from the evidence produced that there is no feasible way, either practicably nor under the agreement and zoning ordinance to mine any aggregate under this "borrow" over burden once it has been removed. In a limited sense the Danens contract was a windfall for Cemstone, in that it happened that fill and dirt was needed at a fairly close location and big 35 ton scrapers could be used without loading and unloading trucks.

Some several months after the Danens-Cemstone contract had been made but before any earth removal was commenced, Cemstone's employees represented by the respondent herein on or about June 7, 1971 struck Cemstone and erected picket lines. This is a legal strike involving a *bona fide* labor dispute so far as the evidence discloses. Danens employees are unionized, represented by Local No. 49 of the Operating Engineers. Cemstone's employees also are unionized and for the most part are represented by the respondent General Drivers Local No. 120, though Cemstone does employ some members of the same Local No. 49 for the operation of its bulldozers, front-end loaders and heavy equipment.

Danens commenced earth removal operations on June 25, 1971 and moved its heavy equipment to the site. It built a separate "haul" road to its tract and later marked it with a sign or signs exclusively for its use. At the time, respondent's pickets were at the principal entrance to the Cemstone plant and property on the westerly side of the 400 acre tract. None were on the easterly edge around the Danens prospective operation. On June 28th, however, the respondent's pickets moved to the vicinity of the Danens operation and some 12 of them physically blocked the specially Danens built haul road which crosses in part Cemstone property to give access to

the "borrow" area. Negotiations and attempts at friendly settlement between the parties proved fruitless. With the exception of one day after June 28th, Danens' operations have ceased. Its representative testified that the cost of its idle equipment approximates $3,500 per day; that it has no corporate or other connection with Cemstone; that it has no labor dispute with its own Union, Local 49, and is not involved in the labor dispute between respondent General Drivers Local 120 and Cemstone; that its Union employees will not cross picket lines, but were the pickets to be removed it could proceed, as it did during a brief respite on June 29th when the pickets were removed until about 3:30 in the afternoon; that it is suffering serious injury but cannot move its equipment elsewhere and must have such available to meet its 45 day deadline when, if at all, the strike is settled.

■ Danens solicited the aid of the Association of General Contractors and at its request a proceeding was instituted before the National Labor Relations Board. The charge made is that of a secondary boycott, which is defined in petitioner's brief as an attempt by the union to force a person with whom it does not have a labor dispute—Danens —to cease doing business with some other person with whom the Union does have a labor dispute—Cemstone. Section 10($l$) of the Act authorizes the Board in cases of a claimed violation of Sec. 8(b) (4) to apply to the court for an interlocutory injunction to enjoin any party charged with an unfair practice from continuing the same "pending the final adjudication of the Board with respect to such matter", if after investigation "the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true." The purpose of the Act is to retain matters in status quo prior to the alleged violations until the Board itself has time to hold a hearing and process the claim.

The Board asserts that there is reasonable cause to believe that an unfair labor practice is affecting commerce and that such practice interferes with the performance of a contract between two persons—Danens and the State of Minnesota—not involved in the labor dispute.

■ The question before the court is whether under the circumstances recited above, the petitioner has made a sufficient showing to justify and warrant the granting of an injunction. This court does not determine on the merits whether or not the union's conduct constitutes a secondary boycott, but whether there is reasonable cause to believe that an unfair labor practice has been and is being committed. Stated another way, are there reasonable grounds to believe that the Board will, following its hearing find respondent guilty of an unfair labor practice and if such be the finding and it be appealed, will a Circuit Court affirm the Board in its holding?

It is clear at the outset that this case does not involve the classic secondary boycott where a union attempts to picket a third-party who is buying, selling or dealing in products manufactured, sold or produced by a "struck" employer. Respondent argues that the philosophy of the Labor Relations Act is that of self-help; that the purpose the Union has in striking and throwing up picket lines is to discourage and prevent if possible, customers dealing with the employer and buying its product; that the union and employer are engaged in an economic war which in all likelihood ultimately will be settled; that Danens is just another customer purchasing from Cemstone and has the misfortune to be a customer who cannot get his material until the strike is settled; that the pickets are only on or adjacent to Cemstone property and are not treating Danens any differently than any other customer; that such does not constitute a secondary boycott and strategically to permit the payment of $20,000 to $30,000 to Cemstone weakens the Union's position with it and flies in the face of the philosophy of the Act.

The petitioner admitted on inquiry from the court that if the contract between Danens and Cemstone had been for the purchase of aggregate or ready-mix cement, which is Cemstone's principal business, the action by respondent union would not be an unfair labor practice. He distinguishes the present case however on the ground that the Danens' contract is incidental to Cemstone's business and amounts to but an insignificant sale of its product or merchandise and not related to its usual operations. The analogy in reality is that "borrow" is but a by-product. The Union answers that whether such is a large part or a small part of Cemstone's marketing operations, it is a sale by it of some of its products and is not distinguishable from other sales to other customers, the determinative feature not being the size of the sale. Further there is evidence that at times and from time to time similar activity by Cemstone employees has been carried on to remove overburden for mining purposes. At the hearing petitioner did not urge the so called reserved gate doctrine espoused by Local 761, Int'l Union of Elec., Radio and Machine Workers v. N. L. R. B., 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961), and it seems rather clear to the court that the doctrine has questionable application here. The "reserved gate" cases involve for the most part contracts for maintenance or the performance of non-revenue producing services by union members on the premises.

■ From the decisions construing Section 8(b) (4) has emerged the general rule that picketing at the situs of the primary dispute, which is in most cases on or adjoining the premises of the struck employer, is considered protected primary picketing and does not run afoul of the Act, being instead protected by 8(b) (4)'s proviso. This is true regardless of the effect that such picketing at the primary situs may have on secondary or neutral employers conducting business at that site or elsewhere. Every strike has, and is intended to have a secondary effect on some neutral third parties with whom the employer has a contract either to sell or to purchase or otherwise does business.

■ One notable exception to this general protection of on-site picketing is the so-called "reserved gate" rule articulated in the General Electric case, International Union of Elec., Radio & Machine Workers v. N. L. R. B., supra. See also N. L. R. B. v. Local 282, Int'l Bro. of Teamsters, 428 F.2d 994, 1001 (2d Cir. 1970). Under this rule, in certain circumstances, picketing at the situs of the primary dispute (here, on the premises of Cemstone) which adversely affects a neutral or secondary employer conducting business at that situs may be an unfair labor practice within the purview of § 8(b) (4) (i) and (ii) (B) only if all three of the following conditions are present:

"there must be a separate gate marked and set apart from other gates; the work done by the men who use the gate must be unrelated to the normal operations of the employer and the work must be of a kind that would not, if done when the plant were engaged in its regular operations, necessitate curtailing those operations." 366 U.S. at 681, 81 S.Ct. at 1293.

Thus, in this case, the petitioner must demonstrate that the posted haul road —for purposes of argument assumed here to be a "reserved gate"—meets the requirements of General Electric and its progeny. The parties have cited only one case, International Chemical Workers Union et al, 179 N.L.R.B. No. 26 (Case 23–CC–309), shedding light on the meaning of the "unrelated to the normal operations" requirement, and the facts of that case are so dissimilar from those in the case at bar that it is not particularly helpful.

■ There is evidence establishing the relationship of Danens' earthmoving work to Cemstone's "normal operations". It would appear in this case that Cemstone has sold the borrow to Danens as a normal byproduct of its mining operations and in the usual

course of its business, and that its obligations to the Village of Lakeland required as a necessary element of its doing business at this site that it accomplish the removal of that borrow. Further as to other portions of its acreage, it has from time to time found it necessary to strip or remove overburden and the present removal is not altogether unique. On that basis this record does not establish a reasonable likelihood that the requirements of *General Electric* have been met.

In the absence of reasonable cause to believe that a violation of the Act will be found, which this court believes has not been established, injunctive relief requested under Section 10($l$) and pursuant to Fed.R.Civ.P. Rule 65 must be and is hereby denied.

A separate order has been entered.