**LAWHON CONSTRUCTION COMPANY et al., Plaintiffs,**

**v.**

**CARPET, LINOLEUM & RESILIENT FLOOR DECORATORS, LOCAL 1179, Defendant.**

**Civ. A. No. 18739-2.**

United States District Court,
W. D. Missouri, W. D.

Aug. 31, 1973.

Supplemental Opinion Oct. 2, 1974.

---

Harry L. Browne and James G. Baker of Spencer, Fane, Britt & Browne, Kansas City, Mo., Robert A. Brown, of

Brown, Douglas & Brown, St. Joseph, Mo., for plaintiffs.

Robert L. Uhlig of Blake & Uhlig, Kansas City, Kan., William A. Jolley of Jolley, Walsh, Gordon & Staab, Kansas City, Mo., for defendant.

## MEMORANDUM AND JUDGMENT

COLLINSON, District Judge.

This is an action for damages for alleged violations of section 8(b)(4) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(b)(4) (1970). Jurisdiction is based on section 303 of the Act, 29 U.S.C. § 187 (1970). By stipulation of the parties, this case was tried on March 20, 1973, without a jury solely on the issue of liability. Plaintiffs Mo-Kan Carpet, Inc., and Carpet Services failed to appear at trial and the Court ordered that the complaint of these two plaintiffs be dismissed with prejudice for failure to appear.

The facts of the case are for the most part uncontroverted. Plaintiff Lawhon Construction Company was the prime contractor for the construction of the Fine Arts Building at Western Missouri College in St. Joseph, Missouri. Lawhon subcontracted with Mo-Kan to furnish and install the carpet in the building and Mo-Kan subcontracted with Carpet Services for the actual installation. At all times relevant to this proceeding, Carpet Services was operating under a labor contract with the International Union of District 50, Allied and Technical Workers of the United States and Canada.

The construction site for the Fine Arts Building, the situs of the dispute from which this cause arises, was located on the east side of Downs Drive in St. Joseph. Downs Drive bordered the site on the west and then curved to the east beyond the southern border of the site. There were two entrances to the building relevant here. The first was a service driveway located at the northwest corner of the building and the second an entrance from Downs Drive near the center of the building. For the purposes of this opinion, these entrances will be designated as the northern and southern entrances.

On September 24, 1970, a picket from defendant union began picketing the job site along the west side of the building from the north project limits to the south project limits. The banner carried by the picket read:

Carpet Services is breaking down established working conditions of Carpet, Linoleum and Resilient Floor Decorators Union, Local 1179, AFL–CIO, 101 East Armour.

When the picket first appeared, some members of the other crafts and unions engaged in the construction of the building ceased work immediately. Others continued on the job beyond that time, but by Monday, September 28, 1970, all union members had honored the picket line and work at the site ceased. On September 28, 1970, Lawhon established a "separate gate" at the northern entrance to the building. A sign was posted at this entrance which stated in substance that this was a separate entrance for all trades designated by name. All trades at the site were listed except for the carpet and tile trade. The picket continued to walk the entire length of the work site, including the area in front of the separate entrance designated for members of the other crafts.

On the day the picket first appeared, the construction superintendent at the site, Herbert Wiltz, contacted Richard Meyers, business manager of the defendant union, with regard to the presence of the picket. While there is conflict in the testimony concerning the exact content of that discussion, it is clear that Meyers informed Wiltz that Carpet Services was tearing down area wage standards and working conditions, and the picket would be removed if the Carpet Services employees left the construction site.

The picket left the job site on October 9, 1970, apparently under the terms and conditions of a settlement agreement en-

tered into between the union and Carpet Services after the latter filed a complaint with the National Labor Relations Board (the Board). The following provision was included as part of the settlement agreement: "The execution of this Agreement by the undersigned Union does not constitute an admission of a violation of the National Labor Relations Act."

Plaintiff Lawhon alleges that the objective of the union's picketing was to force Lawhon and the other contractors at the site to cease doing business with Carpet Services, or in the alternative, to require Carpet Services to recognize or bargain with the defendant union as a representative for some or all of Carpet Services' employees. Plaintiff further alleges that the objective of the union was to force or require assignment of the carpet installation to the employees represented by the defendant. If any of these allegations are proved, the picketing would have been in violation of section 8(b)(4) of the Act. Broadly stated, the issue of law is whether the union attempted by its picketing to "induce, coerce, or restrain" neutral employees or employers with the unlawful object of effecting a secondary boycott.

This is a "common situs" case, *i. e.* one where a neutral employer is engaged along with the primary employer in different activities on the same premises. Common situs picketing at a construction site violates the Act's ban on secondary boycotts unless it is conducted in conformity with the criteria established in Moore Dry Dock Company, 92 N.L.R.B. 547 (1950).[1] Markwell & Hartz, Inc., 155 N.L.R.B. 319 (1965), enf'd, Markwell & Hartz, Inc. v. NLRB, 387 F.2d 79 (5th Cir. 1967), cert. denied, 391 U.S. 914, 88 S.Ct. 1808, 20 L.

Ed.2d 653 (1968). Plaintiff alleges nonconformance with only one of the four *Moore Dry Dock* standards—that picketing must be limited to places reasonably close to the location of the situs of the dispute. Plaintiff argues that this is conclusively demonstrated by the evidence showing that picketing continued in front of the separate gate established at the site. It is undisputed that a separate gate was established at the northern entrance to the job site and that the union did picket that gate after it had been posted as the entrance for employees of neutral employers. Wiltz, plaintiff's superintendent at the site, testified that a sign was posted at the northern entrance indicating that this was a separate entrance for all the trades working at the site except for the carpet and tile people. The record indicates that no attempt was made to notify the union of the separate gate and the only notice attributable to the union was through the picket. The business agent of the union testified that he had never been informed of the sign or of the separate gate. The record does not indicate that the southern gate was posted or restricted in any manner.

The defendant argues that Lawhon failed to adequately limit the situs of the dispute to the southern gate. We agree. The purpose of a separate gate is to permit lawful picketing in such a manner that will "minimize its impact on neutral employees insofar as this can be done without substantial impairment of the picketing in reaching the primary employees." Crystal Palace Market, 116 N.L.R.B. 856, 859 (1956). While the Board has held that picketing at a neutral gate may indicate noncompliance with the *Moore Dry Dock* standards, Center Plumbing & Heating Corp., 145 N.L.R.B. 215, 223 (1963), the mere post-

---

1. The Board ruled that picketing the premises of a secondary employer is primary if it meets the following conditions:
  (a) The picketing is strictly limited to times when the situs of dispute is located on the secondary employer's premises;
  (b) at the time of the picketing the pri-

mary employer is engaged in its normal business at the situs; (c) the picketing is limited to places reasonably close to the location of the situs; and (d) the picketing discloses clearly that the dispute is with the primary employer.
92 N.L.R.B. at 549.

ing of signs does not in itself limit the situs of the dispute. O'Brien Electric Company, 158 N.L.R.B. 549, 551 (1966). In determining what constitutes a validly established separate gate for the purpose of limiting the situs of the dispute, the Board has indicated that the designation of the gates and the posting of the signs must clearly indicate to the union that by confining its picketing to the reserved gate, "its message would be carried to all within the legitimate, direct appeal of its picket signs." Timber Buildings, Inc., 176 N.L.R.B. 150, 151 (1969). The signs must also be unambiguous, must refer to deliveries of material to the site, and must clearly designate that *each* gate is restricted for use by either the primary or neutral employees. O'Brien Electric Company, *supra* at 552. Another requirement is that the contractor establishing the gates must notify the union of restrictions placed on the use of the gates by primary and neutral employees. Daniel Construction Company, 192 N.L.R.B. No. 50 (1971).

■ Lawhon failed to satisfy these requirements. No attempt was made to notify the union of the establishment of a separate gate and the record does not indicate that the neutral employees were notified. No attempt was made to limit entry at either gate—the southern gate was not posted at all, much less restricted to the sole and exclusive use of Carpet Services' employees. There was no clear indication from the sign posted at the northern gate that Carpet Services' employees were excluded from entry there—the sign limited entry only by trade designation and not by naming the primary employer. Also, no mention was made with respect to deliveries of material to the site for either the primary or neutral employers. We conclude, therefore, that the union did not violate *Moore Dry Dock* standards by picketing both gates.

■■ Even though the evidence does not show a violation of the *Moore Dry Dock* standards, the defendant may yet be found to have violated the ban on secondary boycotts. The *Moore Dry Dock* standards are only evidentiary standards developed "to be employed in the absence of more direct evidence of the intent and purposes of the labor organization." NLRB v. International Hod Carriers Local No. 1140, 285 F.2d 397, 401 (8th Cir.), cert. denied, 366 U.S. 903, 81 S.Ct. 1047, 6 L.Ed.2d 203 (1960). In the *Hod Carriers* case, the court of appeals held that mere compliance with the *Moore Dry Dock* standards will not validate common situs activity if other conduct of the union shows that its true objective is secondary. 285 F.2d at 401–02. *Moore Dry Dock* standards aside, we conclude from the weight of the credible evidence that the objective of the union was to induce or compel Lawhon to cease doing business with Carpet Services.

This conclusion is amply supported by the record. At the time the picket was placed on the job site the union had no reasonable basis to believe that Carpet Services was breaking down area standards.[2] Meyers admitted at trial that he did not know what wage rate or benefits Carpet Services was paying to its employees, and there is nothing in the record to indicate that there was any reasonable basis for the belief that Carpet Services was paying substandard wages at the time the picketing began. The telephone conversation further supports our finding. In that conversation,

---

2. We are not convinced that the defendant has established the existence of wage standards in the St. Joseph area. While Local 1179 does appear to have jurisdiction extending to and beyond St. Joseph, its primary activity is in the greater Kansas City, Missouri, area. The only evidence of area standards is Meyers' testimony that he had members on three other jobs on the Missouri Western College Campus. Meyers also testified, however, that he had no contracts with any of the concerns in St. Joseph which laid carpet or with any of six statewide general contractors who operated out of St. Joseph. In addition, Meyers testified that the Union had no contracts with any of the nonunion contractors in St. Joseph.

Meyers clearly indicated to Wiltz that the Carpet Services employees would have to leave the job site in order for the picket to be removed. Meyers demanded neither a verification of Carpet Services' wage rate for this job nor that Carpet Services conform to the alleged area standards. That this is sufficient to support a finding that the union had the unlawful object of forcing Lawhon, with whom the union had no dispute, to cease doing business with Carpet Services is clearly shown in International Brotherhood of Electrical Workers, Local 480 v. NLRB, 134 U.S.App.D.C. 178, 413 F.2d 1085 (1969).

Having found that the union engaged in an unfair labor practice in violation of section 8(b)(4)(i, ii)(B) of the Act, we need not consider the other possible violations alleged by the plaintiff.

For the reasons herein stated, it is therefore

Ordered and adjudged that the Court finds for the plaintiff and against the defendant on the issue of liability.

## SUPPLEMENTAL OPINION AND FINAL JUDGMENT

█ In this court-tried matter the issues of liability and damages were separated for trial purposes. On the issue of liability the Court filed a Memorandum and Judgment holding that certain picketing by the defendant union was in violation of the law and set the matter for hearing on plaintiff's damages.

The defendant filed a notice of appeal from this partial judgment, which held this matter in abeyance until the Court of Appeals dismissed the appeal because it was not from a final judgment. Thereafter the Court held a hearing on the issue of damages suffered by the plaintiff.

This evidence disclosed that the completion date for plaintiff's contract was October 29, 1970. The picketing which the Court found was unlawful commenced on September 24, 1970 and continued until October 9, 1970.

Plaintiff's evidence was that the employees of all of its subcontractors had honored the picket line and left the job and that, therefore, their subcontractors had ceased any activity. Upon the cessation of the picketing the plaintiff promptly notified these subcontractors but they did not promptly resume work because they had their employees working on other jobs. The plaintiff established that the final date of acceptance by the owner of the project was January 15, 1971 and the plaintiff's computation of damages was based on the period from October 29, 1970 (the date the contract required the project to be completed) until January 15, 1971 (the date the project was finally accepted by the owner and full payment made).

Of course, it is only natural for the plaintiff to attempt to prove as large a sum as damages as it can. The items claimed by the plaintiff are as follows:

(1) $3047.34 additional cost of supervision by employees of plaintiff from October 29 to January 15. This is a definite bookkeeping sum which was established.

(2) $1470.63, which is 50% of the "extra payroll after October 29, 1970." The plaintiff's explanation of this, as the Court understood it, was that it is 50% of their payroll on the job after October 29; that they were compelled to do a great deal of clean-up work in order to get the job accepted and that this included clean-up work after other subcontractors, which would have been done by them if the job had been completed on time. This figure seems to be based on a rough estimate without any supporting facts or documents and the Court does not find that the plaintiff has satisfied the burden of proof on this item of damages.

(3) $1048.37 for the time spent by executives of the plaintiff on this project after October 29. It was admitted that these executives would have continued to draw their same salaries during this period regardless of

whether they had devoted any part of the time to this project or not. This Court does not feel this is a proper item of damages.

(4) $1995.60 electrical bill from October 29 to January 15.

(5) $51.69 telephone bill from October 29 to January 15.

(6) $6.82 water bill from October 29 to January 15.

(7) $252.30 premium for builder's risk insurance from October 29 to January 15.

(8) $1258.79 interest on unpaid retainage for the period of October 29 to January 15. This interest was computed at the rate of $7\frac{1}{4}\%$ per annum, which is the rate the company established that it was paying for borrowed money during that period.

(9) $8238.00 prorated overhead cost. This is a bookkeeping figure established by prorating the annual overhead expenses of the company against each construction contract the company is performing, prorated according to contract price. The Court itself did a little cross-examination on this figure and there was no satisfactory explanation of how it would have been any less if this project had been completed on October 29, since it was based solely on the full contract price.

There can be no question that the plaintiff was damaged by the unlawful stoppage of work on this project and the Court finds that items (1), (4), (5), (6) and (7) were definitely proved in the sense that the company undoubtedly paid out this money.

The plaintiff's witnesses testified unequivocally that their contract would have been completed on the contract date, October 29, if no picket had appeared. The defendant offered no evidence to contradict this, except some cross-examination about an injured subcontractor, which the plaintiff's witnesses satisfactorily explained.

There is no question that all work on the project ceased during the period the picket was present, and that this was from September 24 until October 9. It is also undisputed that the actual completion date was the following January 15.

Defendant argues that the actual picketing only stopped work on twelve working days, and that the period from cessation of the picketing to completion of the job encompassed sixty-seven working days. Defendant argues that it should only be liable for $\frac{12}{67}$ths of actual damages proved.

This theory is not realistic in view of the facts of this particular case. It is obvious that the general contractor cannot start up his project and expect all his subcontractors to be in full operation the day the picket withdraws. It is equally obvious that subcontractors whose employees worked outside and who were working prior to September 24 could reasonably have expected mild weather until October 29 as the evidence indicated. It is also obvious that the fifteen calendar day delay would delay their work into the first two weeks of November, at which time plaintiff's witnesses testified there was much delay from cold weather.

Defendant argues that all of plaintiff's evidence on the delay was by self-serving statements and not supported by documentary evidence, or evidence of disinterested witnesses. The Court would point out that prior to the hearing on the damage issue the Court caused the plaintiff to file, in separately numbered paragraphs, a complete statement of each item of damage claimed. This statement was filed and defendant had full knowledge of plaintiff's claim of delay past the normal completion date to January 15, and full knowledge of each item of loss claimed. The defendant had an equal opportunity to subpoena the subcontractors whom plaintiff did not call or secure by process the progress reports of the architect in charge of the project.

In other words, there was no surprise in the plaintiff's evidence. Defendant

knew what it would be weeks in advance of the hearing. Defendant argues that there should be an inference that because the plaintiff did not call its subcontractors, or the architect in charge of the project, the testimony of these disinterested parties would contradict plaintiff's evidence. But defendant's argument fails because of the very fact that they were disinterested parties, and equally available to either party.

The Court finds that the plaintiff is entitled to recover as damages the amounts set out in items numbered (1), (4), (5), (6), (7), and (8) above set out and discussed for a total of $6,612.54.

Ordered, adjudged and decreed that plaintiff be, and hereby is, awarded a judgment in the amount of $6,612.54 against the defendant. Costs taxed to defendant.