**LANDGREBE MOTOR TRANSPORT, INC., and Earl F. Landgrebe, Plaintiffs-Appellants,**

v.

**DISTRICT 72, INTERNATIONAL ASSOCIATION OF MACHINISTS & AEROSPACE WORKERS, AFL–CIO, and Local 1227, International Association of Machinists & Aerospace Workers, Defendants-Appellees.**

No. 84–1117.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 12, 1985.
Decided May 17, 1985.

J. Charles Sheerin, Michigan City, Ind., for plaintiffs-appellants.

John F. Schmitt, Lewis, Bowman, St. Clair & Wagner, Indianapolis, Ind., for defendants-appellees.

Before CUDAHY and COFFEY, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

CUDAHY, Circuit Judge.

This case arises out of an incident which took place when plaintiffs tried to cross a picket line manned by members of defend-

ant unions. Plaintiffs filed suit under the federal labor law for damages suffered in the incident, and asserted pendent state claims. They appeal final summary judgment for defendants on the federal claim. We affirm.

I.

Plaintiff Earl F. Landgrebe ("Landgrebe"), a former member of the United States House of Representatives from Indiana, is an officer and employee of Landgrebe Motor Transport, Inc. ("LMT"), a common carrier engaged in freight hauling, the other plaintiff in this case. All of the claims of Landgrebe and LMT are based on a single incident which took place on February 13, 1980. On that date defendants District 72, International Association of Machinists & Aerospace Workers, AFL–CIO, and Local 1227, International Association of Machinists & Aerospace Workers (collectively, the "Union") were on strike at the plant of the Union Rolls Corporation ("Union Rolls") in Valparaiso, Indiana. Members of the Union had been picketing at the plant since November 16, 1979. On February 13th Landgrebe, driving an LMT truck, completed two trips into the Union Rolls plant to pick up and haul away loads of merchandise. During those two trips members of the Union, picketing at the plant gate, stood in front of the truck, attempting to prevent access to the plant, but were not successful in preventing Landgrebe from entering the plant.

Later that day, Landgrebe returned for a third load at the plant. As he approached the plant, driving down county route 250E (also known as "Industrial Drive") after having turned off of US 30, there was a "congregation of additional pickets which was unusual at that particular time." Smaroff Dep. (May 17, 1982) at 39. The pickets and the truck met, though exactly where on 250E is disputed. They may have met "quite a distance from the plant," Smaroff Dep. (May) at 40, at a point from which the entrance to the plant was not visible, Landgrebe Affidavit at 2. On the other hand, they may have met in the vicinity of the primary point of picketing, Smaroff Dep. (Oct. 28, 1982) at 45–46, which was "right next to the sign" at the west end of the Union Rolls plant, Smaroff Dep. (May) at 32. In no event was the confrontation more than "one hundred feet, more or less, 250 feet" from the entrance to the plant. Landgrebe Dep. at 130. Landgrebe stopped the truck; the pickets advanced and surrounded it. According to Landgrebe's deposition testimony, the pickets shouted various taunts and obscenities and several swung clubs, hitting the truck, breaking an outside mirror and shattering a side window and showering Landgrebe in the face with broken glass. He also testified that the air lines of the truck were damaged, and it was rendered inoperable for several days. The activities of the pickets ceased upon arrival of the sheriff, but Landgrebe and LMT were unable to pick up the third load of merchandise at the plant.

The complaint commencing this action was filed in the district court for the Northern District of Indiana on February 12, 1982, alleging a claim under section 303 of the Labor Management Relations Act of 1947 (the "LMRA"), as amended, 29 U.S.C. § 187, based on an alleged unfair labor practice by the Union in violation of section 8(b)(4) of the National Labor Relations Act (the "NLRA"), as amended, 29 U.S.C. § 158(b)(4). Pendent state law claims for personal injury and property damage were also asserted. By agreement of the parties, the case was referred to a United States magistrate. Discovery was completed, and on July 26, 1983, the Union moved for summary judgment on the issue of liability under federal labor law. The magistrate granted summary judgment on December 20, 1983, in a thoughtful Memorandum of Decision and Order. The judgment on the federal claim was made final pursuant to Rule 54(b), FED.R.CIV.P., on February 13, 1984.

II.

Summary judgment is appropriate when there is no genuine issue of material fact

and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). In determining whether the moving party has shown there to be no material factual dispute, the court must view the evidence and all inferences to be drawn therefrom in the light most favorable to the opponent of the moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam). However, only those inferences which reasonably follow from the evidence need be considered by the court. *Hermes v. Hein,* 742 F.2d 350, 353 (7th Cir.1984); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt,* 700 F.2d 341, 349 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983).

As amended, subsection (a) of section 303 of the LMRA, 29 U.S.C. § 187(a), declares that it is unlawful for a union to engage in any activity or conduct defined as an unfair labor practice in section 8(b)(4) of the NLRA, 29 U.S.C. § 158(b)(4). Subsection (b) gives any individual injured in his business or property by a violation of subsection (a) a right of action for the damages sustained and the cost of the suit. 29 U.S.C. § 187(b). The suit is subject to the limitations and provisions of section 301 of the LMRA, 29 U.S.C. § 185.[1]

Subsection (b) of section 8 of the NLRA, 29 U.S.C. § 158(b), defines certain actions by labor organizations or their agents as unfair labor practices. Among other things, the subsection defines certain secondary boycotting and secondary picketing as unfair labor practices. *NLRB v. International Longshoremen's Association,* 447 U.S. 490, 504–05, 100 S.Ct. 2305, 2313–14, 65 L.Ed.2d 289 (1980). Secondary activity may be defined as activity in which the union applies economic pressure to a person with whom the union has no dispute regarding its own terms of employment in order to induce that person to cease doing business with, and thereby increase the pressure on, another employer, called the primary employer, with whom the union does have such a dispute. *NLRB v. Local 825, International Union of Operating Engineers,* 400 U.S. 297, 302–03, 91 S.Ct. 402, 405–06, 27 L.Ed.2d 398 (1971); *Local 761, International Union of Electrical, Radio & Machine Workers v. NLRB,* 366 U.S. 667, 671–72, 81 S.Ct. 1285, 1288–89, 6 L.Ed.2d 592 (1961) ("*General Electric*"); R. GORMAN, LABOR LAW 240 (1976). *See* H.R. CONF.REP. NO. 510, 80th Cong., 1st Sess. 43, *reprinted in* 1947 U.S.CODE CONG. & AD.NEWS 1135, 1149. In relevant part, section 8(b)(4) provides as follows:

(b) It shall be an unfair labor practice for a labor organization or its agents—

---

**1.** Presumably this means that the statute of limitations applicable to § 301 claims is applicable to § 303 claims. Neither of these sections has an explicit statute of limitations, and courts have generally applied the most analogous state limitations period. It has recently been held, however, that the 6-month limitation period for filing charges of unfair labor practices (including § 8(b)(4) charges) with the National Labor Relations Board, found in § 10(b) of the NLRA, 29 U.S.C. § 160(b), is applicable to an employee's § 301 suit against her employer and to her implied right of action against her union for breach of its duty of fair representation. *DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). There is language in the opinion which may indicate that the 6-month period applies to a § 301 suit even when not combined with an implied duty of fair representation suit. *See DelCostello,* 462 U.S. at 158–59 n. 12, 103 S.Ct. at 2287 n. 12. However, neither party has

even remotely suggested that the statute of limitations issue might be important to deciding this case, so we refrain from considering whether *DelCostello* mandates application of the 6-month § 10(b) period where the underlying concerns of that short period, such as stability of collective bargaining and minimization of workplace interference, are not present. *Compare Park Electric Co. v. International Brotherhood of Electrical Workers, Local 701,* 593 F.Supp. 1060 (N.D.Ill.1984) (*DelCostello* does not mandate application of § 10(b) period to § 303 suit based on § 8(b)(4) unfair labor practice; courts should continue general practice of applying most analogous state limitations period, there the 5-year period for tortious interference with contract) *with Monarch Long Beach Corp. v. Soft Drink Workers,* 593 F.Supp. 384 (E.D.N.Y. 1984) (under *DelCostello* § 303 suit based on § 8(b)(4) unfair labor practice is barred by § 10(b) limitations period).

. . . .

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

. . . .

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

. . . .

29 U.S.C. § 158(b)(4).

The final clause of the quoted portion of § 8(b)(4) (the "Proviso") exempts from the provision primary strikes and primary picketing. *United Steelworkers v. NLRB*, 376 U.S. 492, 499, 84 S.Ct. 899, 904, 11 L.Ed.2d 863 (1964). Primary strikes are those which are directed against the employer with whom the union has the dispute concerning terms of employment. Primary picketing is picketing, generally at the situs of the primary employer, that attempts or is intended to increase the direct economic pressure on the primary employer by inducing others to honor the strike.

The question presented by this appeal is whether there was a material issue of fact as to whether the conduct of the Union members was protected primary activity within the meaning of the Proviso to section 8(b)(4). If so, summary judgment was improper; if not, summary judgment was proper.

### III.

The activity on the first two trips was located at the gate of the Union Rolls plant, Landgrebe knew the purpose of the pickets and whom their dispute was with and his access to other employers was never affected. Nevertheless, Landgrebe and LMT make three arguments in support of the proposition that this picketing and related activity was secondary and not primary. They first argue that the picketing was violent on the third trip and so not primary. Second, they argue that, since LMT is not the primary employer and the picketing clearly had as "*an* object," *see* § 8(b)(4) (emphasis added), preventing LMT from doing business with Union Rolls, it is secondary. Third, they argue that by advancing down route 250E the pickets left the primary site and hence engaged in either ambulatory or common-situs picketing, and thus, on these facts, secondary activity. The first two arguments are disposed of by our decision in *Bedford-Nugent Corp. v. Chauffeurs, Teamsters & Helpers, Local Union No. 215*, 358 F.2d 21 (7th Cir.), *cert. denied*, 385 U.S. 821, 87 S.Ct. 48, 17 L.Ed.2d 59 (1966), and we turn to them first.

■ There is no doubt the conduct of the Union—or more accurately that of its involved members and officials—was, at least as described by Landgrebe, violent, deplorable and, perhaps, tortious. However, primary picketing excluded by the Proviso from the definition of unfair labor practices under section 8(b)(4) does not become illegal secondary activity because it is accompanied by threats and violence. *United Steelworkers*, 376 U.S. at 501–02, 84 S.Ct. at 904–05; *Federal Prescription Service, Inc. v. Amalgamated Meat Cut-*

*ters & Butcher Workmen,* 527 F.2d 269, 274 (8th Cir.1975); *Bedford-Nugent,* 358 F.2d at 24. The legality of violent picketing, if primary, must be determined under other sections of the statute or under state law. *United Steelworkers,* 376 U.S. at 502, 84 S.Ct. at 905; *Bedford-Nugent,* 358 F.2d at 24. Thus the fact that violence was used in stopping Landgrebe and LMT from reaching the Union Rolls plant does not show there to be a disputed issue of material fact as to whether the picketing was primary or secondary.[2]

Indeed, in this regard the facts in the present case do not seem distinguishable from those in *Bedford-Nugent.* In that case union members not only picketed at the primary employer's locations, but also placed nails and tacks at the entranceways to the premises, shot an air pistol at the radiators and windshields of the vehicles of approaching customers, blocked entranceways with pickets who refused to stand aside and threatened physical injury and property damage to customers who attempted to or did enter the primary employer's premises. *Bedford-Nugent,* 358 F.2d at 23.

Landgrebe and LMT's second argument is that even if this is a case of primary picketing activity, so long as "an object" of the activity is to prevent secondary employees, such as employees of trucking firms, from doing business with the primary employer, it falls outside the protection of the Proviso, and so is prohibited by sections 8(b)(4) and 303.

■ Primary activity is protected even though it may seriously affect neutral third parties. *Operating Engineers,* 400 U.S. at 303, 91 S.Ct. at 406; *United Steelworkers,* 376 U.S. at 502, 84 S.Ct. at 905; *General Electric,* 366 U.S. at 673, 81 S.Ct. at 1289.

Indeed, "however severe the impact of primary activity on neutral employers, it [is] not thereby transformed into activity with a secondary objective." *National Woodwork Manufacturers Association v. NLRB,* 386 U.S. 612, 627, 87 S.Ct. 1250, 1259, 18 L.Ed.2d 357 (1967). Some disruption of the business relationships between the primary and secondary employers "is the necessary consequence of the purest form of primary activity." *Operating Engineers,* 400 U.S. at 304, 91 S.Ct. at 407. Primary picketing

> has traditionally been a major weapon to implement the goals of a strike and has characteristically been *aimed* at all those approaching the situs whose mission is selling, delivering or otherwise contributing to the operations which the strike is endeavoring to halt.

*United Steelworkers,* 376 U.S. at 499, 84 S.Ct. at 904 (emphasis added).

Thus primary picketing always has as one of its goals the inducement of secondary employees to, for example, stop handling the primary employer's goods. Since the foreseeable disruptions necessarily caused by the purest form of primary activity are clearly protected by the Proviso, *Operating Engineers,* 400 U.S. at 304, 91 S.Ct. at 407; *United Steelworkers,* 376 U.S. at 496, 84 S.Ct. at 902; *General Electric,* 366 U.S. at 672, 81 S.Ct. at 1288; *Meter v. General Drivers Local 120,* 329 F.Supp. 1348, 1352 (D.Minn.1971), the object of inducing such disruptions must be likewise protected. This inducement of secondary employees is treated as "incidental" to the primary picketing, and so is sheltered by the Proviso. R. GORMAN, LABOR LAW 254 (1976); *666 Cosmetics, Inc. v. Davis,* 347 F.Supp. 389, 392 (S.D.N.Y. 1972).[3]

---

**2.** We also note that Landgrebe testified that he had stopped his truck and decided not to pick up the cargo before the violence occurred. Landgrebe Dep. at 51–52. Thus the violence was apparently not what caused him to cease doing business with the primary employer, and may be irrelevant to his labor law claim.

**3.** Because we do not think this is a common-situs case, *see infra* at 248, we do not regard the

statements in *George E. Hoffman & Sons, Inc. v. International Brotherhood of Teamsters, Local No. 627,* 617 F.2d 1234, 1241 (7th Cir.) ("To be lawful a strike must be for objectives wholly 'primarily.' [sic] Any 'secondary' objective will bring the union's action within the reach of § 8(b)(4)."), *cert. denied,* 449 U.S. 937, 101 S.Ct. 335, 66 L.Ed.2d 160 (1980), as controlling in this regard. *Hoffman* is a common-situs case and

This court has applied these principles in the past. In *Bedford-Nugent* we recognized that the union's activities there were undertaken

> in part for the purpose of inducing customers to refuse to transport or otherwise handle plaintiff's [the primary employer's] goods and materials, or to perform any services, or in order to threaten, coerce or restrain plaintiff's customers. The object of the activities was to force such customers to cease doing business with plaintiff and to force plaintiff [to accede to the union's demands.]

*Bedford-Nugent*, 358 F.2d at 23. However, since the activity took place at the premises of the primary employer, the activity was primary, and so protected by the Proviso. *Id.* at 24. Therefore, the fact that the Union had as an object the prevention of LMT's truck from picking up the third load does not transform the picketing from primary to secondary. And this fact does not tend to show a disputed issue of material fact, nor is it a basis upon which a jury could find that this picketing was secondary.

We now turn to Landgrebe and LMT's third argument that the activity of the Union here was secondary not primary. They argue that by moving away from the Union Rolls gate down county route 250E for a distance not exceeding 250 feet, the picketers left the primary situs and became, in essence, either roving or common-situs picketers. They conclude that therefore the standards enunciated in common-situs and roving picketers cases are applicable. Though this argument is not without plausibility, we decline to follow it on these facts, no matter how generously construed.

The evidence at this stage in this case consists of the depositions of Landgrebe and of Robert Smaroff, Manager of Administration and Personnel Services at the Union Rolls plant, and an affidavit executed by Landgrebe. The district court relied heavily on the deposition of Landgrebe and less on those of Smaroff. Dist.Ct.Mem. at 3. It is not disputed that during the first

two trips the pickets were located right next to the gate of the Union Rolls plant. On the third trip, they were, according to Smaroff's testimony, either "quite a distance from the plant," Smaroff Dep. (May) at 40, or in the "vicinity" of their usual station at the plant gate, Smaroff Dep. (Oct.) at 45–46. At his own deposition, Landgrebe testified as follows concerning the distances involved:

Q Was every act that you refer to in ... [the relevant parts] of your complaint committed on or about the picket line area at the Union Rolls plant?

A The best of my recollection, I'll say yes.

(Landgrebe Dep. at 55.)

. . . .

Q And that all occurred on February 13, 1980?

A Yes.

Q And at the picket line at Union Rolls Corporation?

A All right, I'll say yes.

(Landgrebe Dep. at 71.)

. . . .

Q Where did each of those acts that you referred to in your complaint occur?

A On the highway approaching the entrance to Union Rolls.

(Landgrebe Dep. at 113.)

. . . .

Q What acts are you complaining of in your complaint that did not occur at the Union Rolls facility?

A Well, another thing, they happened in the road, the highway. It did not happen at the Union Rolls Corporation facility.

Q It happened at the entrance to the Union Rolls facility, did it?

A No, it did not happen at the entrance to the Union Rolls Corporation facility.

Q How far from the entrance?

did not purport to overrule *Bedford-Nugent*,    which is not.

A   Well, hundred feet, more or less, 250 feet. I don't know exactly. I didn't measure.

Q   That's pretty much in the general vicinity of the Union Rolls plant, isn't it?

A   Pretty close by, that's right.

Q   Pretty close, isn't it?

A   Right.

Q   Did anything happen to you anywhere other than that 150 foot radius of the Union Rolls facility that you're complaining about in your complaint?

A   I guess not, no.

(Landgrebe Dep. at 130–131.)

Landgrebe's testimony does not support any inference that the pickets were not in close proximity to the plant gate. Thus the picketing remains primary, and so protected by the Proviso. *United Steelworkers*, 376 U.S. at 500, 84 S.Ct. at 904; *Helgesen v. International Association of Bridge, Structural & Ornamental Ironworkers, Local Union 498*, 548 F.2d 175, 182–83 (7th Cir.1977) (failure to confine picketing to employer's gate was not, under circumstances, evidence that union acted with secondary object); *Meter v. General Drivers Local 120*, 329 F.Supp. at 1352.

Landgrebe and LMT argue that even if the incident occurred in close proximity to the plant, it is not primary because of some other facts. According to Landgrebe's testimony and affidavit the incident took place across a railroad spur and on the other side of an entrance to an uninvolved third-party plant near the Union Rolls entrance. Plaintiffs claim that access to this neutral plant (and others which could be reached by proceeding further down route 250E) was thereby effectively blocked. They contend that therefore the common-situs or ambulatory picketing cases apply, and the picketing is not primary.

█  Common-situs picketing, for which construction sites are a typical setting,

takes place when neutral (secondary) employees are working at the same site as the striking employees, though on different activities. *Lawhon Construction Co. v. Carpet, Linoleum & Resilient Floor Decorators, Local 1179*, 394 F.Supp. 520, 523 (W.D.Mo.1973), *aff'd*, 513 F.2d 723 (8th Cir. 1975) (per curiam). Although permitted, common-situs picketing can be secondary and hence unlawful if the union directs its efforts towards the neutral employees. However, if the standards set out in *Sailors' Union of the Pacific (Moore Dry Dock Co.)*, 92 NLRB 547 (1950), are satisfied, the picketing is presumptively primary. *General Electric*, 366 U.S. at 677–81, 81 S.Ct. 1291–93; *NLRB v. National Association of Broadcast Employees & Technicians, Local 31*, 631 F.2d 944, 950–51 (D.C.Cir. 1980). However, the *Moore Dry Dock* standards may not be mechanically applied, and the court must look at the totality of the union's conduct. *Helgesen*, 548 F.2d at 182–83. Activity in compliance with the standards may still be secondary, *Lawhon Construction Co.*, 394 F.Supp. at 524, and activity not in compliance with the standards can be primary, *Helgesen*, 548 F.2d at 182–83.

Here, however, we do not have a common-situs setting. LMT was not denied access to any neutral employer. As Landgrebe admitted, he was going only to the primary plant, and there is no indication that there were any neutral employers located within the Union Rolls plant. Nor is there any indication that other carriers or anyone else was denied access to the neutral plants by the advanced position of the pickets.[4]

Nor does the advance of the pickets down county route 250E transform this into an ambulatory picket incident such as that presented in *Great Coastal Express, Inc. v. International Brotherhood of Teamsters*, 511 F.2d 839, 842 (4th Cir.1975), *cert. denied*, 425 U.S. 975, 96 S.Ct. 2176, 48

---

4.  Since this is not a common-situs incident, the claimed fact that the pickets were not carrying signs identifying Union Rolls as the object of the strike (which would be a failure to meet one of

the elements of the *Moore Dry Dock* test) is not relevant. Also, Landgrebe testified he knew the pickets' dispute was with Union Rolls.

L.Ed.2d 799 (1976), or *Ritchie v. United Mine Workers,* 410 F.2d 827, 835–36 (6th Cir.1969). The pickets did not follow Union Rolls trucks to the LMT depot, nor did they pursue LMT trucks. The only contact between LMT and the Union was on the three occasions Landgrebe tried to enter the Union Rolls plant. There was no pressure put on LMT or its employees to strike. There was no pressure on LMT except insofar as LMT was trying to do business with Union Rolls and its truck therefore approached the picket line at the plant.

We are aware that there is no "glaringly bright line" between primary and secondary activity, *General Electric,* 366 U.S. at 673, 81 S.Ct. at 1289, and that the dividing line has been the subject of intense litigation, *United Steelworkers,* 376 U.S. at 496, 84 S.Ct. at 902. If LMT had been denied access to one of its other customers, or if the pickets had advanced all the way to the LMT terminal or even out to highway 30, we would have a different case. But the facts here strike us as remarkably similar to those in *United Steelworkers.*

In *United Steelworkers,* the union struck an employer (Carrier Corp.) and picketed several plant entrances. Adjoining the struck plant was a railroad spur used to make deliveries to the struck plant and to several neutral plants. Prior to the day of the incident in question, railroad personnel made several trips to service the neutral employers.

On March 11 a switch engine manned by a regular switching crew made one trip serving the three nonstruck corporations. It then returned, this time manned by supervisory personnel, with 14 empty boxcars. The pickets, being aware that these cars were destined for use by Carrier, milled around the engine from the time it reached the western side of Thompson Road, attempting to impede its progress. By inching its way across the road, however, the locomotive succeeded in reaching and entering the gate. After uncoupling the empties just inside the railroad right-of-way, for future use by Carrier, the engine picked up 16 more cars which Carrier wanted shipped out and made its way back toward the gate. This time resistance from the picketing strikers was more intense. Some of the men stood on the footboard of the engine, others prostrated themselves across the rails and one union official parked his car on the track. Invective and threats were directed toward the operators of the train, and only after the pickets were dispersed by deputies of the Onondaga County sheriff's office was it able to pass.

376 U.S. at 494–95, 84 S.Ct. at 901–02. The court held that even though accompanied by threats and violence and even though located off property owned by the primary employer and on a right of way used to serve neutral employers, the picketing was primary. 376 U.S. at 499–501, 84 S.Ct. at 904–905. "For the purposes of § 8(b)(4) picketing at a situs so proximate and related to the employer's day-to-day operations is no more illegal than if it had occurred at a gate owned by Carrier." 376 U.S. at 500, 84 S.Ct. at 904.

■ We see no facts in the record before us which lead us to think that the picketing here could be deemed ambulatory or common-situs, and hence perhaps secondary, while that in *United Steelworkers* was as primary as if at the plant's own gate. We therefore conclude that none of the three arguments offered by Landgrebe and LMT is sufficient to show that there is a disputed issue of material fact concerning whether the picketing was secondary. Summary judgment was therefore properly granted for the defendant Union, and the magistrate's order is AFFIRMED.