586 F.2d 1234
 99 L.R.R.M. (BNA) 3321, 84 Lab.Cas. P 10,892
 PICKENS-BOND CONSTRUCTION COMPANY and Horton Drywall and
Accoustical Tile, Inc., Appellees-Cross Appellants,
v.
UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA,
LOCAL 690, Appellant-Cross Appellee.
PICKENS-BOND CONSTRUCTION COMPANY and Horton Drywall and
Accoustical Tile, Inc., Appellants-Cross Appellees,
v.
UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA,
LOCAL 690, Appellee-Cross Appellant.
 Nos. 77-1978, 77-1989.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 12, 1978.
Decided Nov. 7, 1978.
 
 Philip E. Kaplan, Kaplan, Brewer, Bilheimer & Marks, Little Rock, Ark., for appellant.
 Ann E. Owings of House, Holmes & Jewell, and Oscar E. Davis, Jr., of Friday, Eldredge & Clark, Little Rock, Ark., for Pickens-Bond.
 Ann E. Owings, and Philip K. Lyon of House, Holmes & Jewell, Little Rock, Ark., for Horton.
 Before ROSS, Circuit Judge, HENLEY, Circuit Judge, and MARKEY, Chief Judge.*
 MARKEY, Chief Judge.
 
 
 1
 The United Brotherhood of Carpenters and Joiners of America, Local 690 (Union) appeals from a judgment awarding damages to Pickens-Bond Construction Company (Pickens) and Horton Drywall and Accoustical Title, Inc. (Horton) under the Labor Management Relations Act of 1947 (Act), § 303, 29 U.S.C. § 187. Pickens and Horton cross-appeal the amount of damages and the finding that the Union did not violate § 301 of the Act, 29 U.S.C. § 185. We modify slightly the damages awarded Horton, and affirm the judgment in all other respects.
 
 Background
 
 2
 Pickens, the general contractor in construction of the First National Building in Little Rock, Arkansas, and Horton, one of several subcontractors, had collective bargaining agreements with the Union.[1] Brown's House of Carpet (Brown), the carpeting subcontractor, further subcontracted the installation of carpet to James Morris d/b/a Morris Carpet Company (Morris). Believing agreement with the Union necessary, Morris, on November 20, 1974, began negotiations with Mullins, a Union agent. No agreement was reached. Morris rejected the proffered Union contract covering all his jobs, desiring a contract limited to this particular job. The Union claims that Morris said he couldn't pay union scale on other jobs. Morris maintains that his refusal was prompted by unwillingness of his employees to join the Union, and that he never discussed employee wages and fringes.
 
 
 3
 On November 25, 1974, Scott, attorney for Morris and Brown, told Spillers, vice-president of Pickens, of a potential strike at the jobsite. Scott's memo of the conversation has Scott saying he represented Morris, but Scott testified that he mentioned only his representation of Brown. The Union insists that strategies and tactics for dealing with Morris were discussed in meetings of Scott with Pickens' attorneys, one of the latter being made available to Scott at no charge.
 
 
 4
 On December 19, 1974, Spillers met with Union officials to discuss Morris. Spillers asserts, and the Union denies, that it sought the names of bidders on the job and help in obtaining a contract for a unionized subcontractor. In subsequent meetings, the Union reiterated its position that Morris would have to sign a contract covering all of its carpeting jobs.
 
 
 5
 At a meeting on January 24, 1975, Mullins gave Spillers a copy of a letter, sent that day to Morris, announcing the Union's intent to picket the jobsite because Morris did not meet area standards. Pickens contends, and the Union denies, that this was its earliest reference to Morris' wage scale. The parties dispute the substance of a January 28th meeting of Morris with officials of the Union and Pickens.
 
 
 6
 A picket appeared at the jobsite on the morning of January 29th,[2] the date of Scott's letter to Mullins denying the allegations in the January 24th letter. Spillers said he asked Mullins on January 30th, "What do you want me to do, to get James Morris off the job?"; to which Mullins answered, "that we could not picket him if he was not on the job."
 
 
 7
 Virtually no one crossed the picket line the first day. The Union told its members to decide for themselves whether to cross. The Union refused requests of Pickens and Horton to order the unionized employees back to work. A Union official told some carpenters that good union men would never cross. Whether Union representatives told Horton employees that crossing might cause trouble "down the line," that the next strike might be against an accoustical contractor like Horton, and that they would want that strike honored, is disputed. Woods, a steward, told Pickens employees that he would not cross for fear of being fined. After the first day, employees of Pickens, Horton, and several other subcontractors, gradually returned to work. The picket continued until February 5th.
 
 The District Court
 
 8
 The court based its holding that the Union engaged in unfair labor practices,[3] in violation of § 303 of the Act, 29 U.S.C. § 187,[4] on these findings:
 
 
 9
 (1) The Union asked Pickens to use a unionized subcontractor.(2) The Union offered to cease picketing on Pickens' replacement of morris.
 
 
 10
 (3) The Union refused requests by Pickens and Horton to instruct the unionized employees to return to work.
 
 
 11
 (4) Union representatives told Horton employees that the next strike might be against an accoustical subcontractor, that they would want it honored and that they might have trouble "down the line" if they crossed.
 
 
 12
 (5) The Union told some carpenters that good union men don't cross picket lines.
 
 
 13
 (6) The Union told its members to decide for themselves whether they would cross.
 
 
 14
 (7) Woods told Pickens' employees that he was afraid he would be fined if he crossed.
 
 
 15
 (8) The Union did not inquire into wages paid by Morris or ask the location of Morris' other jobs.
 
 
 16
 (9) In his initial conversations with Spillers, Scott spoke only of Brown and did not say Morris was a subcontractor on the job.
 
 
 17
 The Union's non-violation of § 301 of the Act, 29 U.S.C. § 185,[5] rested on these findings:
 
 
 18
 (1) The request that the Union tell striking employees of Pickens and Horton to return to work was directed to those specific workmen.
 
 
 19
 (2) There was no dispute between the Union and either Pickens or Horton, within the meaning of their collective bargaining agreements.
 
 Issues
 
 20
 The issues are whether the district court erred: (1) in holding that the Union violated § 303 of the Act; (2) in holding that the Union did not violate § 301 of the Act; or (3) in its assessment of damages to Pickens and Horton.
 
 OPINION
 I. § 303
 
 21
 Section 303 of the Act, in relevant portion, prohibits inducing employees to strike, and threatening or coercing neutral employers, where an object of either activity is to cause any person to cease doing business with any other person. "Primary" activities, i. e. those directed against the employer who, like Morris, is a party to the labor dispute, do not violate the section, but "secondary" activities, i. e. those directed against third parties who, like Pickens and Horton, are not concerned in the primary dispute, do violate the section. Local 761, International Union of Electrical, Radio & Machine Workers v. NLRB, 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961). In sum, because § 303 condemns certain union conduct directed to a specific objective, its violation requires a combination of actions and so-called " secondary" intent.
 
 
 22
 a. The Findings
 
 
 23
 We reject the Union's challenge to the trial court's findings. Findings of fact by a trial court sitting without a jury are presumed correct and cannot be set aside unless clearly against the weight of the evidence when viewed in the light most favorable to the prevailing party. Anderson v. Federal Cartridge Corp., 156 F.2d 681 (8th Cir. 1946); Fed.R.Civ.P. 52(a).[6] The complaining party has the burden of proof. Snodgrass v. Nelson, 503 F.2d 94 (8th Cir. 1974).
 
 
 24
 In the present case, each of the contested factual findings is directly supported by substantial oral testimony or documentary exhibits in the record. The Union's attacks go to the weight to be given opposing evidence and to the credibility of witnesses. As examples, the Union attacks Spillers' testimony that it requested Pickens to use a unionized subcontractor on the ground that Spillers was unable to recall certain alleged meetings and on his alleged derogatory remarks about Union representatives. The Union's January 24th letter to Morris, and Morris' reluctance to sign the Union's contract, are cited as outweighing the opposing testimony of four witnesses, one characterized by the Union itself as "independent, undenied and unbiased." The testimony of Horton employees, that Union officials threatened them during the strike, is said to deserve little weight in view of the employees' bias and opposing testimony of Union officials.
 
 
 25
 As specifically recognized in Fed.R.Civ.P. 52(a), a trial court exposed to the evidence first hand is far better situated than an appellate court reviewing the cold record to resolve these "Your word against mine" predicaments. See Dumas v. King, 157 F.2d 463 (8th Cir. 1946). After reviewing the entire record in light of the Union's arguments, we can discern no basis whatever for any conclusion, much less a definite and firm conviction, that the trial court erred. See generally United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 788, 92 L.Ed. 1147 (1948); Warnecke v. MacDonald Construction Co., 323 F.2d 715 (8th Cir. 1963).
 
 
 26
 b. Inducement, Coercion and Threats
 
 
 27
 The Union erroneously contends that the trial court erred in determining that certain acts constituted threats, coercion or inducement within the meaning of § 303.
 
 
 28
 Two facts defeat the Union's contention respecting threats and coercion: (1) its request that Pickens use a union subcontractor and (2) its remark that dismissal of Morris would end all picketing.
 
 
 29
 The Union characterizes the latter remark as a simple restatement of the "Moore Dry Dock" standards, note 2 Supra, offered in response to Spillers' repeated inquiry, "What do you want me to do, to get James Morris off the job?" Selection among permissible inferences raised by the evidence is primarily a function of the trial court and findings thus made will stand unless clearly erroneous. See Dumas v. King, supra. We find no clear error in the trial court's characterization of the Union's remark. It was calculated to suggest to Pickens, a contractor deeply involved in a major construction project at the time, that cessation of relations with Morris was the easiest way to avoid further work interruptions.
 
 
 30
 The Union's contentions respecting inducement are defeated by its statements to Pickens and Horton employees during the picket. "Induce or encourage," as used in the statute, is a phrase broad enough to include every form of influence and persuasion. International Brotherhood of Electrical Workers v. NLRB, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951). Courts have recognized the naturally persuasive effects of picket lines and have imposed on unions the duty of taking some steps to overcome them. Vulcan Materials Co. v. United Steelworkers, 430 F.2d 446 (5th Cir. 1970), Cert. denied, 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247 (1971) (Vulcan); Wagner Electric Corp. v. Local 1104, International Union of Electrical, Radio and Machine Workers, 496 F.2d 954 (8th Cir. 1974) (citing Vulcan, supra, with approval). The record reflects the Union's complete disinterest in diminishing the probable secondary effects of the picket. The Union's statements,[7] though couched in language having a surface neutrality, were calculated to reinforce and had the necessary effect of reinforcing, the naturally persuasive effects of the picket.
 
 
 31
 c. Secondary Intent
 
 
 32
 The Union argues that the facts are insufficient to establish secondary intent. We disagree.
 
 
 33
 Intent is inferred from the nature of acts performed. Compliance with the "Moore Dry Dock" standards would not prevent a finding of secondary intent. Lawhon Construction Co. v. Carpet, Linoleum & Resilient Floor Decorators, Local 1179, 394 F.Supp. 520 (W.D.Mo.1974), Aff'd, 513 F.2d 723 (8th Cir. 1975) (Lawhon).
 
 
 34
 Assuming one object of the picket was to produce Morris' compliance with area standards, "secondary" intent is present if another object was that of forcing Pickens or Horton to cease doing business with Morris. See Wilson v. Milk Drivers and Dairy Employees Union, Local 471, 491 F.2d 200 (8th Cir. 1974).
 
 
 35
 The evidence indicates, however, that the Union's interest in setting the picket was not directed to area standards. It refused Morris' offer of a contract guaranteeing compliance with those very standards at the First National jobsite. It insisted on a contract covering all Morris' other jobs as well. It remained ignorant of the location of Morris' other jobs. It did not change its conduct when Morris denied its allegations respecting area standards.
 
 
 36
 The conclusion is inescapable that the Union sought Morris' removal from the First National job if he did not accept its contractual demands. The Union did not inquire into wages paid by Morris and had no basis for believing that Morris was breaking down area standards. The Union told Pickens the picket would end upon Morris' removal from the job. These facts alone establish secondary intent. See Lawhon, supra.[8] But there is more. The Union picketed only at the First National site, where Morris was willing to pay standard wages. It made no attempt to locate Morris' other jobsites, which were the only sites at which Morris was unwilling to enter a contract. That selective picketing is evidence that the picket here was not set as merely a means of publicizing substandard wages.
 
 
 37
 d. The Ally Doctrine
 
 
 38
 The Union's contention that Pickens lost its neutral secondary employer status by entangling itself in the Union's dispute with Morris is without merit.
 
 
 39
 The ally doctrine concerns employers who are so interrelated that neither can be considered a neutral third party in the labor disputes of the other. Carpet Layers, Local 419 v. NLRB, 139 U.S.App.D.C. 68, 429 F.2d 747 (1970). Common ownership or management, centralized control of labor relations, and interrelationship of operations, are controlling factors. Newspaper Production Co. v. NLRB, 503 F.2d 821 (5th Cir. 1974). A contractor/subcontractor relationship is generally considered insufficient. NLRB v. Denver Building & Construction Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951).
 
 
 40
 The Union claims Pickens went beyond a mere contractor/subcontractor relationship with Morris by (1) urging Morris to get a Union contract for the First National job; (2) providing Scott with free legal service; and (3) urging the Union to sign a one-job contract with Morris. The argument misinterprets the facts. Pickens and Morris were, and remained, independent contractors. Morris contacted the Union only because of a local understanding that Pickens worked union, not because Pickens insisted he do so. There were no prior dealings between Pickens and Morris and Pickens had no economic or managerial control over Morris. The attempt by Pickens to negotiate a settlement of the "Morris problem," amounted to no more than what any general contractor would do to avoid a disruptive and expensive strike on a major construction project.
 
 
 41
 In summary, we find no error in the trial court's findings, in its determination that the Union engaged, with the required secondary intent, in acts of threat, coercion or inducement, within the meaning of § 303, or in its view that Pickens did not lose its neutral secondary employer status.
 
 II. § 301
 
 42
 Section 301 permits suit for breach of a contract between labor unions and employers. Pickens and Horton insist the Union violated modified hiring hall (§ 8) and mandatory grievance procedure (§ 11)[9] provisions of their collective bargaining agreements. We disagree.
 
 
 43
 a. Modified Hiring Hall
 
 
 44
 The referral mechanism of the agreements gives the Union forty-eight hours to fill the employer's "request" for qualified workmen. The Union is not required to send any specific persons the employer may request.
 
 
 45
 Pickens and Horton did not merely ask for certain categories of workers, but insisted that the Union order specific striking employees back to work. The trial court therefore properly found that Pickens and Horton made no "request" for workmen within the meaning of the agreement. Moreover, § 8 of the agreement provides its own remedy in the event the Union does not furnish properly requested workmen. It frees the employer to seek workers outside the Union.
 
 
 46
 b. Mandatory Grievance Procedure
 
 
 47
 A "dispute or grievance" between the employer and the Union regarding compliance with the collective bargaining agreement must exist before its mandatory grievance procedure becomes operative. Even if a no-strike clause be implied from such provisions, See generally Local 174, Teamsters v. Lucas Flour Co., 369 U.S. 95, 81 S.Ct. 902, 5 L.Ed.2d 859 (1962), no strike conducted outside a "dispute or grievance" would violate § 11 of the agreement.
 
 
 48
 The trial court correctly found that there was no "dispute or grievance" between the Union and either Pickens or Horton within the meaning of their agreements. The effects of the picket against Pickens and Horton resulted from a dispute between the Union and Morris. Further, because the picket itself did not violate the agreements, the Union's failure to take steps to abate the resulting "strike," although evidence of a § 303 violation, does not amount to a breach of § 11 of the collective bargaining agreements. See generally Eazor Express, Inc. v. International Brotherhood of Teamsters, 520 F.2d 951 (3d Cir. 1975).
 
 III. Damages
 
 49
 a. Compensatory Damages
 
 
 50
 Pickens insists the trial court erred in not granting damages caused by an alleged strike-related delay in completing the job. Horton finds error in not awarding scaffold removal costs and in miscalculating an item of damages attributable to supervisor salaries. We modify, slightly, the damages determination below.
 
 
 51
 Recovery under § 303 is limited to actual, compensatory, damages, Local 20, Teamsters Union v. Morton, 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964), and the damages must be both non-speculative and proximately caused by Union wrongdoing. Federal Prescription Service, Inc. v. Amalgamated Meatcutters, 527 F.2d 269 (8th Cir. 1976).
 
 
 52
 At trial, the parties stipulated to the costs incurred by Pickens if the court found that the Union's action delayed completion of the job. Apparently finding no such delay, the court awarded no damages under this item. We find no error in that finding. The court's award compensated Pickens for overtime payments, and there is substantial evidence that completion delays were caused by other factors.
 
 
 53
 Horton is not entitled to recover scaffold moving costs, there being no proof that those expenses were proximately caused by the Union's action.
 
 
 54
 We do find, however, an arithmetic error in calculating that item of Horton's damage award attributable to supervisor salaries. The award for that item will be increased twenty ($20) dollars, from $383.88 to $403.88.
 
 
 55
 b. Attorneys' Fees
 
 
 56
 The trial court correctly denied the request of Pickens and Horton for recovery of attorneys' fees. They are not recoverable in a § 303 action, Bryant Air Conditioning and Heating Co., Inc. v. Sheet Metal Workers' International Association, Local 541, 472 F.2d 969 (8th Cir. 1973), and are not recoverable here under § 301 because no violation of that section was made out. See generally United Steel Workers v. Butler Manufacturing Co., 439 F.2d 1110 (8th Cir. 1971).
 
 IV. Conclusion
 
 57
 The trial court's award of damages is modified to the extent of increasing the award to Horton by twenty ($20) dollars. The judgment of the trial court is, to that extent, modified and is in all other respects affirmed.
 
 
 
 *
 The Honorable Howard T. Markey, Chief Judge, United States Court of Customs & Patent Appeals, sitting by designation
 
 
 [1]
 The portions of the agreements relevant here state:
 Section 8. That the union will furnish at the request of the contractor duly qualified journeyman carpenters and registered apprentices in sufficient number as may be necessary to properly perform work contracted for by the contractor, in the manner and under the conditions specified in this Agreement. If not furnished within forty-eight (48) hours, the employer may employ such other men as required.
 Section 11. (a) In the event a dispute or grievance develops, excluding work assignment dispute, on the jobsite between the signatory Union and the Contractor regarding compliance with the terms and conditions of this Agreement, the following procedure shall be pursued within forty-eight (48) hours (Saturday and Sunday excluded provided no work is performed) as the exclusive means for resolving the dispute.
 
 
 [2]
 The parties agree that the picket complied with the "Moore Dry Dock" standards, which require (1) that the picket be limited to times when the situs of dispute is located on the secondary employer's premises; (2) that the primary employer be engaged in his normal business at the situs at the time of the picket; (3) that the picketing take place reasonably close to the situs; and (4) that the picketing clearly disclose that the dispute is only with the primary employer. The standards were first set forth in Sailor's Union of the Pacific, 92 N.L.R.B. 547 (1950)
 
 
 [3]
 The practices charged are defined as follows:
 (b) It shall be an unfair labor practice for a labor organization or its agents
 (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is
 (B) forcing or requiring any person to cease using, selling, handling, transporting or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, . . . National Labor Relations Act, § 8(b)(4)(i)(ii)(B) as amended 29 U.S.C. § 158(b)(4)(i)(ii)(B).
 
 
 [4]
 § 303 provides:
 (a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.
 (b) Whoever shall be injured in his business or property by reason or (of) any violation of subsection (a) may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit. Labor Management Relations Act of 1947, § 303, 29 U.S.C. § 187.
 
 
 [5]
 § 301 provides:
 Suits by and against labor organizations
 (a) Venue, amount, and citizenship. Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court . . . . Labor Management Relations Act of 1947, § 301, 29 U.S.C. § 185.
 
 
 [6]
 The rule states:
 Rule 52. Findings by the Court
 (a) Effect. In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58; . . . Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.
 
 
 [7]
 We need not decide whether Woods was a Union agent. Other remarks, made by admitted Union agents, sufficiently establish Union inducement
 
 
 [8]
 In Helgesen v. International Association of Ironworkers, Local 498, 548 F.2d 175 (7th Cir. 1977), cited by the Union, Lawhon was expressly distinguished by the court on the absence of these facts
 
 
 [9]
 The relevant portions of these sections are reproduced at note 2 Supra