631 F.2d 944
 104 L.R.R.M. (BNA) 3121, 203 U.S.App.D.C. 362,
89 Lab.Cas. P 12,174
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
NATIONAL ASSOCIATION OF BROADCAST EMPLOYEES AND TECHNICIANS,
AFL-CIO, LOCAL 31 and National Association of
Broadcast Employees and Technicians,
AFL-CIO, Respondents.
 No. 78-2045.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 15, 1979.
Decided July 23, 1980.
 
 Application for Enforcement Order of the National Labor Relations board.
 Jesse T. Etelson, Atty., N.L.R.B., a member of the Bar of the Supreme Court of New York, pro hac vice, by special leave of Court, Washington, D.C., John S. Irving, Gen. Counsel and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D.C., were on brief, for petitioner.
 Robert Kruger, Roger H. Madon, New York City, was on brief, for respondents.
 Before McGOWAN and MacKINNON, Circuit Judges, and PRATT,* United States District Judge for the District of Columbia.
 Opinion for the Court filed by Circuit Judge MacKINNON.
 MacKINNON, Circuit Judge.
 
 
 1
 The National Labor Relations Board (NLRB or Board) found that various picketing and handbilling activities of the Local 31, National Association of Broadcast Employees and Technicians, AFL-CIO (Local 31), and the National Association of Broadcast Employees and Technicians, AFL-CIO (International) constituted unfair labor practices under § 8(b)(4)(i) and (ii)(B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(i) and (ii)(B) (1976).[1] The Board issued a cease and desist order, and required designated affirmative action.[2] The case is before this Court upon the application of the NLRB pursuant to Section 10(e) of the National Labor Relations Act, 29 U.S.C. § 151 et seq. (1976) for enforcement of its order.
 
 I.
 
 2
 Local 31 is the bargaining representative of ABC's Washington News Bureau's technicians, who operate electronic equipment in connection with ABC's remote news "pickups" in the Washington area for radio and television broadcasts. The International is Local 31's parent body. Recent bargaining negotiations were conducted on a nationwide basis by a negotiating committee consisting of a representative from Local 31 and from each of four other affiliated locals that similarly represent technicians at ABC's facilities in other United States' cities. Edward Lynch, the President of the International served as the coordinator and chief spokesman during the negotiations. The Committee called for a strike and economic action against ABC's news coverage in Washington, D.C. on May 16, 1977. It was arranged that the International would be the go-between for ABC and Local 31 for information as to where and when ABC would be covering news events for purposes of picketing. The International was also to outline the rules applicable to picketing at the various locations.
 
 
 3
 ABC adopted a plan whereby it would set up reserved gates at the news locations for ABC employees usage only. Neutral individuals were to enter other posted entrances at the locations. ABC would also inform the union of these gates. Signs at the reserved gate read:
 
 
 4
 This entrance is reserved for the employees of the American Broadcasting Company, its lessors, subcontractors and vendors. All such persons working for, or doing business with the American Broadcasting Company must enter through this entrance only. This entrance is not to be used by anyone other than the above named persons.
 
 The signs at the neutral gates read:
 
 5
 This entrance is not to be used by the employees of the American Broadcasting Company, its lessors, subcontractors and vendors. All such persons working for, or doing business with the American Broadcasting Company must enter only through the entrance specifically reserved for their use.
 
 
 6
 President Lynch notified ABC that it was the International's position that the reserved gate procedure should not apply to news coverage at locations other than at news stations.
 
 
 7
 This case concerns picketing and handbilling away from ABC's news stations at three separate events and locations: 1) coverage of Vice President Mondale's speech at the Hyatt Regency Hotel in Washington; 2) coverage of Secretary of Transportation Brock Adams' speech at the Mayflower Hotel in Washington; and 3) a speech made by Senator Edward Kennedy at the International Inn in Washington that ABC did not cover. The activity at each hotel will be discussed in detail.
 
 A.
 Hyatt Regency Hotel Activities
 
 8
 The day before Vice President Mondale was to speak at the Hyatt Regency, Kevin Delany, ABC's Assistant Washington Bureau Chief and Director of Television News informed the hotel's banquet manager of the strike and discussed with her the separate entrance plan. The Hyatt designated a side entrance that led into the ballroom where the speech would be held as a reserved gate for ABC employees. Delany then informed the International of the arrangements, concluding that ABC expected any picketing would be confined to the ABC reserved gate. International President Lynch passed this information on to Local 31.
 
 
 9
 The following morning Delany and Hyatt's assistant banquet manager posted the entrance reserved for ABC. They also designated by posting as neutral entrances, barred to ABC personnel, the main hotel entrance on New Jersey Avenue and a nearby VIP entrance. There is no evidence that ABC personnel used any door but the reserved gate.[3] However, neither ABC nor the union policed the entrances.
 
 
 10
 ABC striking employees commenced picketing their reserved gate at approximately 11:00 or 11:15 that same morning.[4] One union member passed out handbills[5] in front of the neutral main entrance to the Hyatt to anyone entering the hotel. The handbill had been prepared by President Lynch of the International and given to Local 31 for distribution. Lynch's reasoning was that the handbills would counteract the fact that the reserved gate for ABC was away from the public eye. Neither the picket signs nor the handbills specifically addressed the speech being covered by ABC, and numerous functions were being held in the hotel.
 
 
 11
 Because of the union activity at the Hyatt, none of the CBS employees also present to cover the Mondale speech would enter the hotel, causing CBS to lose television and radio coverage of the event. Pursuant to a phone call from the hotel's banquet manager, ABC's Delany returned to the site and observed the handbilling at the main entrance. He entered the neutral main entrance to call his ABC superior, whereupon the union commenced picketing the main entrances in front of the hotel.B.
 
 Mayflower Hotel Activities
 
 12
 The circumstances of the union activity at this hotel were similar to those at the Hyatt. ABC decided to give television coverage to the speech Secretary of Transportation Brock Adams was scheduled to deliver at the Mayflower on June 16, 1977. Kevin Delany arranged with the hotel's Director of Security for the establishment of a reserved gate for exclusive use by ABC personnel. The Director of Security suggested a side entrance to the hotel that was also used as the entrance to the apartments in the hotel. They considered this entrance to be the least obstructive and obtrusive to Mayflower's operations. Delany again informed International's President Lynch, who explained the arrangements to Local 31. On the day of the speech, Delany and the Mayflower Director of Security posted the signs specifying the reserved gate, and then posted the neutral entrances at the main door and two other entrances. A number of entrances to the hotel were left unmarked.
 
 
 13
 Later that morning, ABC's Delany observed union members picketing in front of the hotel's main entrance, and in front of one of the unposted entrances, in addition to the ABC reserved gate. The signs were the same as those used in the Hyatt picketing. The evidence before the Administrative Law Judge at the Board hearing showed that the ABC employees used the reserved gate, along with other individuals. Once again, neither ABC nor the union policed the gates. One ABC employee testified that prior to the day presently in question he had used the main entrance on work assignments, and had never used the entrance presently posted as the reserved gate.
 
 C.
 International Inn Activities
 
 14
 ABC decided not to cover Senator Edward Kennedy's speech scheduled for June 16, 1977, so no notice about the event was sent to the International. Nonetheless, Local 31 picketed the hotel, which resulted in a CBS employee delaying his entrance into the hotel.
 
 II
 
 15
 The facts as described above are undisputed, and were adopted by the NLRB from the Administrative Law Judge's opinion. The Board noted that § 8(b)(4)(i) and (ii)(B) of the National Labor Relations Act are designed to cover secondary boycott activities. It applied the four tests of Sailors' Union of the Pacific (Moore Dry Dock), 92 N.L.R.B. 547 (1950)[6] and the reserved gate doctrine from Local 761, International Union of Electrical Workers (General Electric Co.) v. NLRB, 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961) to conclude that the object of the Hyatt Regency Hotel handbilling was to reach employers and persons other than ABC in order to force them not to enter or patronize the hotel. The activity was merely an extension and integral part of the picketing at the ABC reserved gate. Recipients of the handbills and observers of the picketing were unable to determine what event was being boycotted.
 
 
 16
 The Board did not consider the union's disclaimer at the bottom of the handbill[7] to be a serious plea by the union to persuade the public or other companies not to get involved. Since the handbilling was an extension of the picketing to the main entrance, and since it was intended thereby to bring economic pressure on the Hyatt Regency Hotel, CBS and others, to enmesh these neutrals in the union's dispute with ABC, it constituted secondary activity in violation of the Act. The Board also held that the union's activity was not protected consumer publicity.[8] Finally, it held that the situs of the activity was not "primary", which could have afforded the union more liberal picketing. Even though news broadcasting by its very nature involves roving assignments, the Board held that secondary activity at a common situs was involved and the union's action was to be tested by the criteria enunciated in Moore Dry Dock, supra.
 
 
 17
 The Board applied its reasoning regarding the union's attempt to enmesh neutrals in the union's dispute with ABC with equal force to the picketing of neutral or unposted gates at the Mayflower Hotel and found unpersuasive the union's arguments that the gates were not proper "reserved gates" because some neutrals may have used them, or because they may never have been used before by ABC. No evidence was shown that ABC personnel used any entrance but the reserved gates on the days of the speeches. Thus the picketing, like the handbilling, constituted a violation of § 8(b)(4)(i) and (ii)(B).
 
 
 18
 Finally, the Board found, since ABC was not even covering the speech in question, that the union's picketing at the International Inn was a blatant violation of § 8(b)(4)(i) and (ii)(B).
 
 
 19
 For all of the union activities described above, the Board held that both Local 31 and the International were liable in that their conduct was closely intertwined.
 
 III.
 
 20
 The Supreme Court and this Court have emphasized that it is a primary function and responsibility of the Board "to resolve the conflicting interests that Congress has recognized in its labor legislation." NLRB v. Insurance Agents' International Union, 361 U.S. 477, 499, 80 S.Ct. 419, 432, 4 L.Ed.2d 454 (1960); Retail Store Employees Union, Local 1001 v. NLRB, 627 F.2d 1133 at 1147 (D.C.Cir. 1979) (en banc) rev'd on other grounds, NLRB v. Retail Store Employees Union, --- U.S. ----, 100 S.Ct. 2372, 65 L.Ed.2d 377 (1980). For this reason, courts are to give deference to the Board's statutory construction. NLRB v. Local 103, International Association of Iron Workers, 434 U.S. 335, 350, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978). With these principles in mind, we affirm the Board's decision in this case.
 
 IV.
 
 21
 The first issue to be determined is whether the hotels were a primary or secondary situs for ABC employees on the day of the speeches. Generally speaking, union picketing occurring at the primary employer's premises and seeking only the disruption of its normal operation is considered primary and thus protected activity,[9] whereas picketing extending beyond the premises of the primary employer to those of a neutral employer and designed to disrupt the latter's operations is secondary and prohibited. Compare NLRB v. International Rice Milling Co., 341 U.S. 665, 671, 71 S.Ct. 961, 964, 95 L.Ed. 1277 (1951), with NLRB v. United Brotherhood of Carpenters, 184 F.2d 60 (10th Cir. 1950), cert. denied, 341 U.S. 947, 71 S.Ct. 1011, 95 L.Ed. 1371.
 
 
 22
 Initial logic would lead to the conclusion that the hotels were not the primary situs for ABC. However, the union argues that traditional notions of situs should not apply to the broadcasting industry. Since news coverage is one of ABC's main businesses, and since its employees who cover news events must travel to gather the news, the company does have a number of temporary situses that are ambulatory. In many instances, contrary to most industrial or construction site settings, there are no such things as entrances or gates to a situs for news coverage, i. e. fires, streetside crimes, parades, demonstrations. The coverage is often a one time event of short duration. Thus, the union maintains that since ABC's primary business is conducted at these sites, each location should be considered the primary situs of the employer for union activity. However, while news gathering is an important segment of television and radio, so is entertainment and education and advertising.
 
 
 23
 We conclude that broadcasting should not be treated differently under this section of the Act. Once the news reporters and technicians are away from the news station, they are away from their employer's primary situs. Nothing in the legislative history indicates broadcasters should warrant special treatment. And, as noted in the Board's opinion in this case, the very broad language used in describing unfair labor practices in § 8(b)(4)(i) and (ii)(B) indicates that no industry exclusion was contemplated. Thus, we hold that the hotels in this instance were a secondary situs for union activity.
 
 
 24
 The union relies heavily on Local 25, National Association of Broadcast Employees (Taft Broadcasting Co.), 194 N.L.R.B. 162 (1971) to support its argument that the news locations are primary situses. In that case, the Board held that live coverage of a hockey game from a broadcasting booth within a stadium was primary activity for the television personnel working in the booth. Once the "microphones, and the transmission lines were activated during the hockey games", id. at 165, the booth became an extension of the television station. However, live coverage involves a much closer connection with a television station than conventional filming of news events. There is nothing in this record to indicate that ABC was furnishing instantaneous live coverage as in Taft Broadcasting. The Court reserves the question of the correctness of the Taft Broadcasting for a case where facts similar to it are directly before us.
 
 
 25
 Finally, we acknowledge that even had we concluded that the news locations were primary situses, the activity could have been transformed into prohibited secondary activity because of the union's noncompliance with the reserved gates. Courts recognize the establishment of reserved gates either on the primary employer's property, or on common situses. Once a reserved gate is set up, the Court then needs to evaluate the facts under the Moore Dry Dock guidelines, as we do in V.[10]
 
 V.
 
 26
 The second issue before this Court is whether the union picketing and handbilling was lawful primary activity, or illegal secondary activity. In Local 761, International Union of Electrical Workers (General Electric Co.) v. NLRB, 366 U.S. 667, 673, 81 S.Ct. 1285, 1289, 6 L.Ed.2d 592 (1961), the Supreme Court remarked that "(i)mportant as is the distinction between legitimate 'primary activity' and banned 'secondary activity', it does not present a glaringly bright line." The key factor is whether the union activity is aimed at the primary employer or whether it is also aimed at pressuring the secondary employer. We focus, therefore, upon the union's objective. NLRB v. International Rice Milling Co., 341 U.S. 665, 672, 71 S.Ct. 961, 964, 95 L.Ed. 1277 (1951); International Brotherhood of Electrical Workers, Local 480 v. NLRB, 413 F.2d 1085, 1089 (D.C.Cir.1969). To aid in this determination, the Board developed guidelines in Moore Dry Dock. Compliance with the guidelines raises a presumption of valid primary activity. General Electric Co., 366 U.S. at 677, 81 S.Ct. at 1291. However, extrinsic evidence may also be used to establish that picketing has a secondary objective. Id. Ultimately, the Court must look to the totality of the circumstances to determine whether the activity was lawful. Helgesen, Inc. v. International Assoc. of Bridge, Structural & Ornamental Ironworkers, Local 498, 548 F.2d 175, 183 (7th Cir. 1977).
 
 
 27
 In Moore Dry Dock the Board attempted to protect neutral employers from the economic effects of boycotting activities by employees of other employers located at a common worksite. The guidelines aid in determining whether the union's object was primary and lawful, or secondary and calculated to enmesh neutral employers and employees in the union's dispute with the primary employer. The guidelines require that 1) the picketing be strictly limited to times when the situs of the dispute is located on the secondary employer's premises, 2) at the time of the picketing the primary employer is engaged in his normal business at the situs, 3) the picketing is limited to places reasonably close to the location of the situs, and 4) the picketing disclose clearly that the dispute is with the primary employer. 92 N.L.R.B. at 549.
 
 
 28
 Under the first test, it is undisputed that the picketing at the Hyatt Regency Hotel and the Mayflower Hotel was limited to times when the situs of the dispute was located on the secondary employers' premises. The ABC technicians only picketed and passed out handbills the morning of the scheduled speeches. It is also undisputed that the primary employer was engaged in his normal business of covering news events at the time of the picketing and handbilling. Concerning the picketing at the International Inn, we fully agree with the Board that the union activity was a violation of § 8(b)(4)(i) and (ii)(B), since the primary employer had no intention of covering the Kennedy speech, and was in fact not present. The Union does not contest this finding.
 
 
 29
 Compliance with the third criterion presents the problem. Under Moore Dry Dock, the picketing must be limited to places reasonably close to the location of the situs. The union had ample opportunity to picket at the reserved gate. The Supreme Court and this Court have upheld the use of reserved gates under most circumstances.[11] Local 761, International Union of Electrical Workers (General Electric Co.) v. NLRB, 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961); United Ass'n of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry v. NLRB, 416 F.2d 1120, 1125 (D.C.Cir.1969). At the Hyatt, the picketing extended beyond the ABC reserved gate in the form of the handbilling activity in front of the main entrance. The handbills specifically addressed the picketing in progress at the reserved gate, and offered the assistance of the union members to show the recipient the picketing. The handbills appealed to the recipient not to enter the hotel, without ever addressing the event being boycotted. We affirm the Board's finding that the handbilling was an extension of the picketing which was lawful at the reserved gate. However, since the handbilling was conducted away from the reserved gate and thus away from the situs that was lawful for primary activity, the union failed to comply with the third criteria of Moore Dry Dock. By its picketing at the Mayflower Hotel it also failed to comply. Very specific reserved gates had been established, but the union instead chose to picket at neutral and unposted entrances.
 
 
 30
 The union argues that the reserved gates were improper because they were at a distance from the main entrance and were otherwise tainted. However, there is no basis for such claims. Since the objective of the picketing is to reach the ABC employer and employees it is irrelevant that the reserved gates were located away from the main entrance of the hotel. The fact that the employees of ABC may never have used these gates before is also irrelevant, since they had ample warning of the location of the gates that they were to use, and there is no evidence of employee confusion. Again, because there is no evidence of misuse of the entrances or confusion, and because of the ample warning, it is irrelevant that some of the entrances at the Mayflower were unmarked. Further, if neutral individuals had entered the reserved gate, as the union claims happened, this would not taint the reserved gate. Their use of such entrance would in fact help the union, which was purportedly trying to publicize the dispute. Finally, the fact that the gates were not policed is also irrelevant in the absence of evidence to show that ABC employees entered the neutral gates. Therefore, the establishment and use of the reserved gates in this case was proper and untainted.
 
 
 31
 The last test of Moore Dry Dock, whether the picketing discloses clearly that the dispute is with the primary employer, was also not met by the union in its activities at either the Hyatt or the Mayflower. Although the signs and handbills specified that the strike was against ABC, they urged individuals not to enter the hotel in its entirety. In addition, the union did not describe the event being covered by ABC, or where it was being held in the hotel. This failure to designate the event, and calling instead for a blanket boycott of the hotel, also supports the conclusion that under the totality of the circumstances test the union had a secondary objective. Indeed, they were trying to "induce or encourage" individuals other than ABC employees not to enter the hotels.
 
 
 32
 Therefore we conclude that the designation and use of the reserved gates were proper in the instant case. ABC management did all it was required to do, with the assistance of the hotel management, to properly post the gates, and to inform the union of times and places. Yet, the union disregarded these arrangements, and purposefully picketed and handbilled the entire hotel in order to influence neutral individuals not to enter the hotel. These actions constitute unlawful secondary boycotts in clear violation of § 8(b)(4)(i) and (ii)(B).
 
 VI.
 
 33
 The union also maintains that its activity was lawful because it was advising the public concerning a product of an employer with whom the union had a primary dispute. The NLRA exempts such publicity, other than picketing, from the secondary boycott prohibitions under 29 U.S.C. § 158(b)(4).[12] Thus, the union attempts to persuade this Court that the handbilling activity at the Hyatt Regency Hotel constituted lawful consumer publicity.
 
 
 34
 Consumer activity was evaluated and upheld by the Supreme Court in NLRB v. Fruit & Vegetable Packers Local 700 (Tree Fruits), 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964) and recently by this Court in Retail Store Employees Union, Local 1001 v. NLRB, 627 F.2d 1133 (1979) (en banc), rev'd on other grounds, NLRB v. Retail Store Employees Union, --- U.S. ----, 100 S.Ct. 2372, 65 L.Ed.2d 377 (1980). Although it is conceivable that ABC's work could be considered a product capable of being the subject of consumer picketing, see Great Western Broadcasting Corp. v. NLRB, 356 F.2d 434 (9th Cir. 1966), Tree Fruits and Retail Store Employees preclude classification of the handbilling as such in this case. Contrary to the activity in Tree Fruits, the handbilling here was not meant to persuade customers of the hotel not to "buy", "use" or "go to" the struck "product". Instead, it appealed to all individuals not to enter the hotels.When consumer picketing is employed only to persuade customers not to buy the struck product, the union's appeal is closely confined to the primary dispute. The site of the appeal is expanded to include the premises of the secondary employer, but if the appeal succeeds, the secondary employer's purchases from the struck firms are decreased only because the public has diminished its purchases of the struck product. On the other hand, when consumer picketing is employed to persuade customers not to trade at all with the secondary employer, the latter stops buying the struck product, not because of a falling demand, but in response to pressure designed to inflict injury on his business generally. In such case, the union does more than merely follow the struck product; it creates a separate dispute with the secondary employer.
 
 
 35
 377 U.S. at 72, 84 S.Ct. at 1071. We conclude that the union's dispute with ABC overflowed to the point of creating a separate dispute with the hotels.[13]
 
 VII.
 
 36
 The final issue is whether the International union should be held responsible for the prohibited secondary activities of Local 31. We hold that it should. It was involved in contract negotiations between the local and ABC, the local union is financially dependent on the International, the International administers a strike fund in which the local participates, the International informed the local of the picketing rules, its President informed ABC that it objected to the use of reserved gates in these instances, it drafted the handbills that specified that both the International and the local were on strike with ABC, its officials observed the picketing, and most importantly, it acted as a go-between with ABC and the local as to locations and times and gates at the hotels. This is simply too much involvement for the International now to say that it did not participate and should be shielded from responsibility.
 
 
 37
 For these reasons, we grant the Board's application to enforce its order against Local 31 and the International.
 
 
 38
 Judgment accordingly.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 292(a)
 
 
 [1]
 The applicable statutes provide:
 (b) It shall be an unfair labor practice for a labor organization or its agents- . . .
 (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is-
 (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;
 Provided further, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution; . . . .
 
 
 [2]
 The Board's decision and order are reported at National Association of Broadcast Employees and Technicians, AFL-CIO, Local 31, 237 N.L.R.B. No. 222 (1978)
 
 
 [3]
 Delany entered the main entrance of the hotel after observing the allegedly illegal handbilling in front of the hotel. All parties agree that this action tainted the reserved gate process. However, the challenge in this action addresses the activities of the union prior to Delany's entrance at the neutral gate
 
 
 [4]
 The two kinds of picket signs read:
 
 
 [5]
 These handbills read:
 NABET AFL-CIO is on STRIKE against ABC. NABET Local 31 Pickets have been Banished to the back alley, or, around the corner; out of sight. The person distributing this handbill can show you where NABET AFL-CIO is PICKETING ABC's broadcast of THIS EVENT.
 This handbill is addressed exclusively to the individual members of the public and is not an appeal to employees to refuse to perform any service nor is it an appeal to other Companies to refuse to perform any service.
 
 
 [6]
 The Supreme Court summarized these criteria as follows:
 (1) that the picketing be limited to times when the situs of dispute was located on the secondary premises, (2) that the primary employer be engaged in his normal business at the situs, (3) that the picketing take place reasonably close to the situs, and (4) that the picketing clearly disclose that the dispute was only with the primary employer.
 Local 761, International Union of Electrical Workers v. NLRB, 366 U.S. 667, 677, 81 S.Ct. 1285, 1291, 6 L.Ed.2d 592 (1961). If these four criteria are met, the union activity is held to be presumptively valid primary activity.
 
 
 [7]
 See footnote 5 supra
 
 
 [8]
 See Section VI infra
 
 
 [9]
 Such activity is protected under the proviso of § 8(b)(4). Meter v. General Drivers Local 120, 329 F.Supp. 1348, 1352 (D.Minn.1971)
 
 
 [10]
 The presence of reserved gates in the instant case also serves as a reason to distinguish this case from Taft Broadcasting, where there were none. The Board in the instant case used this distinction as a means of getting around Taft Broadcasting. It stated that "(w)hile there are some favorable statements made by the Trial Examiner in his decision adopted by the Board without comment, that case did not involve a 'reserved gate' and the picketing actually complied with Moore Dry Dock standards except for a short period of time." 237 N.L.R.B. No. 222 at 15 n.29
 
 
 [11]
 In the General Electric case, the Court approved the use of reserved gates as long as the neutral individuals using the reserved gates are not entering to perform tasks related to the normal operations of the struck employer. 366 U.S. at 680-81, 81 S.Ct. at 1293. Since the task of those neutral individuals entering the hotel was unconnected with the normal operations of ABC, this caveat is inapplicable
 Various cases hold that if the neutral employees using the neutral reserved gate are making deliveries needed in the day-to-day operations of the primary employer, then picketing of these gates is considered primary activity. United Steelworkers v. NLRB (Carrier Corp.), 376 U.S. 492, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964); Linbeck Const. Corp. v. NLRB, 550 F.2d 311 (5th Cir. 1977).
 
 
 [12]
 See note 1, supra
 
 
 [13]
 This Court restated the Tree Fruits test:
 The test of "threaten(ing), coerc(ing), or restrain(ing)" which we thus distill from Tree Fruits is whether the challenged picketing confines its appeal to the struck product in order to reduce the primary employer's market therefore, or whether the picketing projects its force beyond these boundaries.
 Retail Store Employees Union, Local 1001 v. NLRB, 627 F.2d 1133 at 1144-1145 (1979) (en banc), rev'd on other grounds, --- U.S. ---, 100 S.Ct. 2372, 65 L.Ed.2d 377 (1980).