CARPENTERS LOCAL NO. 33, a/w UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 88–1543.

United States Court of Appeals, District of Columbia Circuit.

Argued March 9, 1989.

Decided April 21, 1989.

As Amended May 26, 1989.

Aaron D. Krakow, for petitioner.

Edward Gorman also entered an appearance, for petitioner.

Margaret G. Bezou, Attorney, N.L.R.B., with whom Collis Suzanne Stocking, Supervisory Atty., N.L.R.B., Robert E. Allen, Associate Gen. Counsel, N.L.R.B., and Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., were on the brief, for respondent.

Before WALD, Chief Judge, and STARR and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

Concurring Opinion filed by Circuit Judge STARR.

Opinion, concurring in the judgment only, filed by Chief Judge WALD.

D.H. GINSBURG, Circuit Judge:

Petitioner, Local No. 33 of the United Brotherhood of Carpenters and Joiners of America (the Union), seeks review of a decision by the National Labor Relations Board, finding that the Union had violated §§ 8(b)(4)(i)(B) and (ii)(B) of the National Labor Relations Act, 29 U.S.C. §§ 158(b)(4)(i)(B) & (ii)(B), by engaging in a secondary boycott in contravention of a reserved gate system established at the site of an area standards dispute. The Union claims that the reserved gate system left it with insufficient access to the public and, moreover, that the Board lacked substantial evidence of unlawful intent. We hold that the Union's public access claim is legally insufficient under the circumstances presented, and that the Union failed to rebut the presumption of unlawful secondary intent arising from its violation of the reserved gate system.

## I. BACKGROUND

Section 8(b) of the NLRA provides, in relevant part, that:

It shall be an unfair labor practice for a labor organization or its agents—

.    .    .    .    .

(4)(i) to engage in, or induce or encourage any individual employed by any person ... to engage in, a strike or refusal ... to ... perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is:

.    .    .    .    .

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in products of any other producer, processor or manufacturer, or to cease doing business with any other person....

## A. *Substantive Standards.*

With § 8(b)(4), Congress sought to preserve "the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes" while at the same time "shielding unoffending employers and others from pressures in controversies not their own." *NLRB v. Denver Bldg. & Constr. Trades Council*, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951). Though "union conduct violates section 8(b)(4) if *any* object of that activity is to exert improper influence on secondary or neutral parties," the Board "must establish that union conduct reveals a specific intent to involve neutrals ... in order to establish a secondary boycott violation." *Local Union No. 501 v. NLRB (Pond)*, 756 F.2d 888, 892–93 (D.C.Cir. 1985). The distinction between lawful union activity and unlawful secondary conduct "is relatively straightforward" where the primary employer occupies a worksite separate from any neutrals; the Board will generally consider picketing at the primary employer's site to be protected activity but will deem picketing at the site of the neutral to be prohibited secondary conduct. *Id.* at 893.

The calculus becomes more complicated, however, when the primary employer and the affected neutral employer occupy the same site. To govern this "common situs" situation, the Board has long employed "an evidentiary tool for determining intent...." *Pond*, 756 F.2d at 893 (emphasis omitted). Specifically, the Board deems union conduct presumptively lawful when:

(a) The picketing is strictly limited to times when the *situs* of dispute is located on the secondary employer's premises; (b) at the time of the picketing the primary employer is engaged in normal business at the *situs;* (c) the picketing is limited to places reasonably close to the location of the *situs;* and (d) the picketing discloses clearly that the dispute is with the primary employer.

*Sailors Union of the Pacific (Moore Dry Dock)*, 92 N.L.R.B. 547, 549 (1950) (emphasis in original). *See also Local 761, Elec. Workers v. NLRB (General Electric)*, 366

U.S. 667, 677, 81 S.Ct. 1285, 1291, 6 L.Ed.2d 592 (1961). Violation of any of the *Moore Dry Dock* standards, while not constituting an unlawful secondary boycott *per se*, "raises a presumption of illegitimate secondary intent." *Pond*, 756 F.2d at 893.

If neutral workers "are performing tasks unconnected to the normal operations of the struck [primary] employer," then the owner of the common situs may establish separate "reserved gates" for the primary employer and neutral employers. *General Electric*, 366 U.S. at 680, 81 S.Ct. at 1293. As we observed in *Pond*, the Board generally has found a violation of the third *Moore Dry Dock* standard—"and thus presumed an illegitimate secondary intent"—when a union has picketed at the gate reserved for neutrals, unless the reserved gate system was "improperly or unreasonably established, not honored, or misused." 756 F.2d at 893–94.

### B. *Factual Background.*

The present dispute centers on an eight-story office building located at 262–266 Summer Street in Boston. There is a 25–foot wide public passageway between the rear portion of the buildings along Summer Street and the rear of the buildings that face Congress Street, which runs parallel to Summer Street. The building in question has only two entrances that provide access to the full interior (as opposed to a street-level business only). The front entrance, on Summer Street, leads to a passenger elevator that the ALJ found to be "small, about two by four feet." The rear entrance, facing the passageway, provides access to a freight elevator that is eight feet square.

William Vanderweil and Gary Vanderweil are the partners of the 262 Summer Street Realty Trust, which owns and operates the building. The Vanderweils are also the principals of R.G. Vanderweil Engineers, Inc. (RGVE), a firm engaged by the Trust to design electrical and mechanical systems in connection with renovation of the building. RGVE moved its offices into the building in March 1987. Several other businesses are building tenants.

1. *The Labor Dispute.* In October 1986, RGVE, acting on behalf of the Trust, hired CB Construction Company, Inc., a non-union general contractor, to implement the renovation plans. The Union had a long-standing dispute with CB Construction over "area standards." (The Board has long held that a union "legitimately may be concerned that a particular [non-union] employer is undermining area standards of employment [obtained by the union through collective bargaining with unionized employers] by maintaining lower standards." *International Hod Carriers, Local 41*, 133 N.L.R.B. 512 (1961).) Therefore, when RGVE hired CB Construction, the Union began picketing the front entrance to the building with signs stating that RGVE was "using a scab construction company who does not conform to area standards" established by the Union. In addition, the Union picketed at an RGVE office located elsewhere in Boston and at Gary Vanderweil's home in Cohasset.

In January 1987, a federal district court enjoined the picketing. Upon the filing of unfair labor practice charges against it, the Union stipulated that it had no dispute with either RGVE or the Trust. An Administrative Law Judge found that the Union had violated §§ 8(b)(4)(i)(B) and (ii)(B) by naming RGVE, the neutral employer of the targeted construction firm, as the object of its picketing, contrary to the fourth *Moore Dry Dock* standard. The Union did not file exceptions to this ruling, and the Board subsequently accepted the ALJ's decision.

In February 1987, the Union resumed picketing at the front entrance to the building, this time with signs saying that "CB Construction is a scab contractor," and the district court ruled that its injunction did not prohibit such picketing. In March 1987, the Trust established a reserved gate system at the building by designating the front entrance for use by all employees, suppliers, and visitors *except* those of CB Construction, and by designating the rear entrance for the exclusive use of CB Construction. Signs reciting these limitations were posted at each entrance. After Robert Marshall, an organizer for the Union,

examined the site, however, he opined that the Trust had not properly established the reserved gate system and that the Union therefore could continue to picket at the front entrance.

2. *The ALJ's Decision.* Based on a charge filed by CB Construction, the Acting Regional Director of the Board issued a complaint alleging that the Union had again violated §§ 8(b)(4)(i)(B) and (ii)(B). After a hearing, an ALJ found no violation, concluding that "the gate here set aside for the union to picket [facing the public passageway at the rear of the building] is effectively hidden from the view of the general public, and is so remotely and inconveniently located as to substantially impair the effectiveness of the union's picketing, calculated to reach the primary employer's employees, suppliers[,] visitors and the general public." The General Counsel filed exceptions to the ALJ's ruling.

3. *The Board's Decision.* The Board reversed the ALJ, holding that the Union had violated §§ 8(b)(4)(i)(B) and (ii)(B). In particular, the Board concluded that:

> [T]he restriction of picketing in the instant case to the primary reserved gate's immediate vicinity would not substantially impair the effectiveness of the Respondent Union's lawful [area standards] picketing.... *The determination of where to locate the primary gate was limited in the subject case to two choices*—the Summer Street entrance and the rear passageway entrance. *Space limitations with respect to the Summer Street entrance and front lobby elevator made use of that entrance by CB employees performing renovation work infeasible.* In addition, the rear entrance had been utilized by the primary employer's employees prior to the establishment of the reserved gate system. Thus, the designation of the rear entrance reflects a choice that cannot be characterized as reflecting a calculated "bad faith" ploy specifically designed to render ineffective the Union's picketing.

(Emphases added.) The Board went on to cite specific evidence from the record, indi-

cating that the primary reserved gate provided the Union with "some access to the public and full access to the primary employer, its employees, suppliers, and visitors." For the legal sufficiency of such access, the Board relied upon its earlier decision in *United Bhd. of Carpenters, Local 354 (Sharp & Tatro)*, 268 N.L.R.B. 382, 389 (1983), which upheld a reserved gate system at a construction site that provided the union with access to a "limited public" composed of "tenants of nearby apartments, their visitors, and prospective customers or business callers." Since the Union's objectives would have been "effectively served without substantial impairment by the established primary reserved gate," the Board "infer[red] unlawful secondary intent from the Union's neutral gate picketing...."

## II. STANDARD OF REVIEW

In *Sign and Pictorial U., Local 1175 v. NLRB*, 419 F.2d 726, 734 (D.C.Cir.1969), we outlined the relationship between the Board and its subordinate fact finders for purposes of judicial review:

> Since the Board is the agency entrusted by Congress with the responsibility for making findings under the statute, "it is not precluded from reaching a result contrary to that of the [ALJ] when there is substantial evidence in support of each result." ... [T]he Board is free to substitute its judgment for the [ALJ]'s, although of course it is desirable that the basis of disagreement be made clear. The Board's rejection of the conclusions of its [ALJ] when the facts are undisputed will ordinarily not be disturbed on judicial review.

## III. THE RESERVED GATE SYSTEM

The Union's attack on the reserved gate system proceeds in two steps. First, the Union argues that the legal standard applied by the Board—the "limited public" standard of *Sharp & Tatro*—is inconsistent with § 8(b)(4). According to the Union, such a standard would contravene its "protected interest in communicating its area standards dispute with [the primary em-

ployer] to the general public." *Pond*, 756 F.2d at 896. Second, on the assumption that it is correct about the applicable legal standard, the Union contends that there is not "substantial evidence sufficient to support the conclusion that the Union's ability to convey its message to the general public was not substantially impaired." The Board responds to the Union's first point by claiming that a standard requiring exposure to only a "limited public" is reasonable in light of the purpose of § 8(b)(4) to accommodate the rights of neutral employers with those of the Union. Accordingly, we turn first to determine the proper legal standard for the analysis of a secondary boycott charge under the present circumstances.

■ The essential premise of the Union's claim is that it need not respect a reserved gate system when the only gate that the primary employer can possibly use to conduct its business activities happens to be in a location that would give the Union access to only a limited public, whereas another gate at the common situs would provide access to the general public. For this, the Union relies heavily on *Pond*, in which we held that a union need not limit its pickets to the primary reserved gate when the owner of the site has established that gate "in a manner that unreasonably denies the union an opportunity to convey its message to the public." 756 F.2d at 897.

*Pond* involved a construction site with two entrances in a rural residential area. In anticipation of union picketing, the general contractor reserved the main entrance—located along a heavily travelled public road—for neutral, unionized subcontractors, *id.* at 890; the general contractor set aside the other entrance—at the end of a cul-de-sac "virtually hidden from all public view," according to the stipulation of the parties—for the use of the primary, non-union subcontractor and, hence, for the union's picketing. *Id.* at 896 (emphasis omitted).

In *Pond*, there was no suggestion that either entrance would have rendered impracticable the work of any of the subcontractors concerned. Likewise in the other

common situs Board cases discussed in Chief Judge Wald's separate opinion. *See Sharp & Tatro; International Bhd. of Electrical Workers, Local 453 (Southern Sun)*, 237 N.L.R.B. 829 (1979). By contrast, the Union in the present case does not dispute the Board's finding that CB Construction simply could not have performed its work through any gate other than the rear entrance that the Trust reserved for it. As the Board made clear, the problem is not one of added expense; rather, the limited space at the front entrance and in the passenger elevator there would have made it "infeasible" for CB Construction to conduct its work. The Union, furthermore, does not question the Trust's right to establish some form of reserved gate system; indeed, the Supreme Court has sanctioned the owner's prerogative to take such action, provided that neutrals using the reserved gate do not perform tasks related to the normal operations of the primary employer. *General Electric*, 366 U.S. at 680–81, 81 S.Ct. at 1293–94. *See also J.F. Hoff Elec. Co. v. NLRB*, 642 F.2d 1266, 1270–71 (D.C.Cir.1980); *NLRB v. National Ass'n of Broadcast Emp.*, 631 F.2d 944, 951 n. 11 (D.C.Cir. 1980).

The present situation is functionally equivalent to one in which a non-unionized primary employer does business at a single, fixed location that just happens to be isolated from public view, but the union, in order to publicize its dispute with the primary employer, conducts area standards picketing at the site of an unrelated neutral employer at a separate location that offers better access to the public. Such conduct would plainly constitute a violation of § 8(b)(4), since the union's right is only to picket where it finds the primary employer—represented by his employees, as here, or his goods, in the case of a product boycott, *see NLRB v. Retail Store Employees Union*, 447 U.S. 607, 100 S.Ct. 2372, 65 L.Ed.2d 377 (1980); *NLRB v. Fruit Packers*, 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964)—and not, if the two are in different places, where it finds the general public.

■ We quite agree with the Board, therefore, that the balance of competing interests envisioned by § 8(b)(4) does not require "primary reserved gate placements calculated to maximize a picket's chances to reach members of the public." Moreover, the Board found that the neutral employer in this case did nothing calculated to minimize the public exposure of union pickets. The implication of the Board's analysis is that where the only alternative configuration of reserved gates would preclude the neutral employer from dealing with the primary employer, the union must take the primary employer as it finds him; under this analysis, it is simply irrelevant whether such a reserved gate system provides the union with access to the general public, a "limited public," or, for that matter, no public.

The Board appears to have come to the same conclusion of law. As Judge Starr's separate opinion reflects, however, the Board also went on to canvas the evidence supporting a finding of access to a "limited public"; and as Judge Starr details, it was substantial.

## IV. SECONDARY INTENT

■ In order to find a violation of § 8(b)(4)(i)(B) or (ii)(B), the Board must find that the union conducted its neutral gate picketing with the object of "forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in products of any other producer, processor or manufacturer, or to cease doing business with any other person...." 29 U.S.C. § 158(b)(4)(i, ii)(B). Based upon the establishment of a *bona fide* reserved gate system and the Union's persistence in picketing at the neutral gate, the Board inferred that the Union had done so with an unlawful purpose.

In *Pond*, we stated that the Board may presume unlawful intent based upon a violation of the third *Moore Dry Dock* standard, as has occurred here. 756 F.2d at 893. The Union contends that this presumption, standing alone, is insufficient evidence of secondary intent; application of that presumption, according to the Union,

would create a *per se* rule, contrary to *Pond*'s admonition for the Board to evaluate the "totality of circumstances" before finding a violation of § 8(b). *Id.*

These contentions misapprehend the nature of the presumption that follows from a violation of a legitimate reserved gate system. As we went on to explain in *Pond*, this presumption "amounts to an evidentiary device for gauging another evidentiary device (the third *Moore Dry Dock* standard) that structures the Board's inquiry into whether common site picketing was intended to enmesh neutrals." *Id.* at 894. The search for union intent is an inherently difficult enterprise. That the Board ultimately must rule based on the "totality of circumstances" does not preclude it from using reasonable presumptions which, if left unrebutted by the union, may be controlling in a particular case.

Apart from presumptions, moreover, William Vanderweil testified that when the Union picketed at the front entrance to the building, before the reserved gate system had been established, a contractor hired by the Trust to service the passenger elevator refused to cross the picket line and, after the district court's injunction, again refused to work as long as CB Construction remained on the job. The Union acknowledges this evidence but maintains that the Board may not thereby infer "that there was any foreseeable consequence of continued picketing.... *after* the dual [reserved] gate system was established...." (Emphasis added.) We disagree. Surely prior experience may inform the Board's inquiry into the Union's intent when it resumed the picketing, and the prior experience here suggests that the Union conducted the picketing at issue with an awareness that such action could induce a secondary boycott. People generally are presumed to intend the foreseeable consequences of their acts, and no consequence is more foreseeable than one that has been produced under similar circumstances in the past. Other things being equal, hindsight is the best basis for foresight.

In the alternative, the Union contends that it rebutted any inference of secondary

intent by offering the testimony of its organizer, Robert Marshall, to the effect that he examined the two reserved gates and made a "good faith judgment" that the Union could legitimately continue picketing at the front gate. No doubt. But if such a self-serving judgment could rebut the presumption sanctioned by *Pond*, then that presumption would, for obvious reasons, not be worth the time of day.

Though we reject the evidence proffered by the Union here, we reiterate what we said in *Pond:* A presumption is not a *per se* rule. Apart from the partisan judgment described above, the Union made no effort to assure that neutral persons would not become enmeshed in its dispute with CB Construction. This is not a case, for example, in which the union sought and received assurances from others serving the worksite that they would cross the union's picket lines. Under such conditions, without any actual secondary activity, the Board could not simply rely upon the presumption of secondary intent but would indeed have to weigh the "totality of circumstances."

On the present facts, however, the Board properly applied a presumption of secondary intent, left unrebutted by the Union.

## V. OTHER UNION CONTENTIONS

The Union offers two additional arguments, but they are little more than makeweights. Under § 8(b)(4)(i), the Board must show that the union "induce[d] or encourage[d]" employees to refuse to perform services in the course of their employment. 29 U.S.C. § 158(b)(4)(i). Similarly, under § 8(b)(4)(ii), the Board must prove both that the union had an unlawful object and that it "pursue[d] its object by threatening, coercing, or restraining the neutral business." *Soft Drink Workers Union, Local 812 v. NLRB*, 657 F.2d 1252, 1261 (D.C.Cir.1980). The Union argues that we must overturn the Board's decision, or at least remand for additional proceedings, based upon the Board's failure to make specific findings on these questions.

Neither reversal nor any additional proceeding is warranted, however, on these grounds. The Board expressly concluded that the Union had violated the Act "[b]y inducing and encouraging" employees of RGVE, the Trust, and other employers to refuse to perform services and by "threatening, coercing, and restraining" those employers. Given the Union's violation of a legitimate reserved gate system, we have no reason to doubt the legal grounds for this conclusion. If an employer establishes a reserved gate "marked and set apart from the other gates" and "such a gate is used exclusively by members of the secondary [neutral] employer," then "picketing at that gate will be interpreted as an attempt to persuade the secondary employees to strike or to persuade tertiary employees to refuse to cross the line, thus illegitimately coercing the secondary employees to cease doing business with the primary employer until the primary employer's dispute with the union shall have been favorably concluded." *NLRB v. Local 282, Int'l Broth. of Teamsters*, 428 F.2d 994, 1001 (2d Cir. 1970).

Finally, the Union argues that the First Amendment prevents the Board from punishing peaceful picketing on the public streets absent proof, apart from a presumption, of an unlawful secondary objective. As we made clear in *Pond*, however, a union "cannot assert an independent first amendment right to picket the neutral gate" if, as here, "that action *properly* constituted a violation of section 8(b)(4)." 756 F.2d at 894 n. 3 (emphasis in original) (citing *International Bhd. of Elec. Workers v. NLRB*, 341 U.S. 694, 705, 71 S.Ct. 954, 960, 95 L.Ed. 1299 (1951)).

## VI. CONCLUSION

The Union's claims of access to the public being insufficient as a matter of law, and the Board having properly inferred a secondary intent from the Union's violation of the reserved gate system, we affirm the Board's conclusion that the Union conducted an unlawful secondary boycott. Accordingly, the petition for review is denied and the application for enforcement is granted.

STARR, Circuit Judge, concurring:

The Board, it seems to me, could reasonably conclude that an "infeasibility" analy-

sis would justify the establishment of an otherwise bona fide reserved gate system. The order before us contains intimations to this effect, as the court notes. However, after reviewing the Board's order in its entirety, I understand it to rest more centrally on the conclusion that sufficient public access existed in this instance to satisfy the governing standard as elucidated in *United Bhd. of Carpenters, Local 354 (Sharp & Tatro)*, 268 N.L.R.B. 382, 389 (1983), and approved in *Local Union No. 501 v. NLRB*, 756 F.2d 888, 895 (D.C.Cir. 1985) (*Pond Electric*).

Accordingly, the central issue before us is whether substantial evidence supports the Board's decision in applying its clearly established standard. In my view, that test is abundantly satisfied here. In brief, the evidence shows: (1) use of the rear entrance and nearby public parking lot by the primary employer, its employees, suppliers, and visitors; (2) use of the rear entrance and public parking lot by the building's tenants, employees, and visitors of both, including customers of CCSI, a small business with its front entrance in the rear passageway; (3) use of the public parking lot by members of the general public; and (4) occasional pedestrian traffic from the public parking lot to the rear entrance of the Cafe La Brioche, a restaurant located next door with a back entrance near the reserved gate. Since *Sharp & Tatro* represents the Board's current view of what constitutes a reasonable accommodation of the various competing interests, the foregoing evidence is more than ample to satisfy the "limited public access" standard.

WALD, Chief Judge, concurring in the judgment only:

I concur in the decision to affirm the Board's finding that the Union violated § 8(b)(4). I do so, however, on the narrow ground that there is substantial evidence in the record to support the Board's factual determination that the back-alley primary gate was not effectively hidden from the "general public." [1] I wish, however, to voice strong disagreement with Judge Ginsburg's rationale that area standards picketing can legally be restricted by the employer to a location which affords the Union no access whatsoever to the general public.[2] The Board itself has not adopted such a sweeping position [3] and, indeed, such a position is totally at odds with both Board precedent and our decision in *Local Union No. 501 v. NLRB (Pond)*, 756 F.2d 888 (D.C.Cir.1985).

The central flaw in Judge Ginsburg's position is its premise that the neutral employer here (the Vanderweil Trust) has an absolute right under *Moore Dry Dock* principles, *Sailors Union of the Pacific (Moore Dry Dock)*, 92 N.L.R.B. 547 (1950), to establish a reserved gate system and confine area standards pickets to one gate; since there was only one possible configuration of gates, Judge Ginsburg reasons, the Union's access to the public at the primary gate is "irrelevant." But there is no *absolute* right to establish the reserved gate system in the first place. As the Board has repeatedly stated:

1. The Board concluded that there was light pedestrian traffic in the alley-way consisting of people taking a shortcut between the boardwalk at one end of the alley through to Congress Street and people who might be travelling from the public parking lot behind Vanderweil's building either to one of the back entrances of Summer Street businesses or passing through to Congress Street. While I find the evidence supporting this conclusion unpersuasive, I cannot conclude that it is insubstantial.

2. It appears to me that Judge Starr's concurrence is, like mine, based on the substantiality of the evidence supporting the Board's conclusion that the Union had sufficient access to the public at the primary gate. I, therefore, do not regard Judge Ginsburg's primary rationale that public access was "irrelevant," as a majority opinion in this case.

3. The Board nowhere in its opinion suggests the broad principle asserted by Judge Ginsburg that the amount of public traffic in the back-alley behind Vanderweil's building is "irrelevant." There is no question from my reading of the decision, that, had the Board agreed with the ALJ that there was too little public exposure in the alley, the Union would have been entitled to picket at the front door on Summer Street, *regardless* of the fact that C.B. Construction itself was physically constrained to use the back door.

When a concerned labor organization finds itself, consistently with *Moore Dry Dock*'s requirements, presumptively constrained to picket "reasonably" close to some primary employer's reserved gate effectively hidden from public view, or so remotely located as to substantially impair the effectiveness of the labor organization's otherwise lawful picketing calculated to reach the primary employer's personnel, suppliers, visitors *and the general public—no circumscription, designed to confine or restrict the area within which permissible common situs picketing may be conducted, would be warranted.*

*United Brotherhood of Carpenters, Local 354 (Sharp & Tatro)*, 268 N.L.R.B. 382, 387 (1983) (emphasis added); *see also International Brotherhood of Electrical Workers, Local 453 (Southern Sun)*, 237 N.L.R.B. 829, 830 (1979); Joint Appendix ("J.A.") 267 (Board Decision). I can find no support, whatsoever, for the proposition that if there is no gate system practically available that would afford adequate public exposure to the Union, the neutral's "right" to be free of picketing wins out over the Union's "right" to picket:

> When confronted with "common situs" situations, such as the situation presented herein, this Board and the courts require the labor organizations concerned to accommodate the right of neutral employers to remain immune from the full impact of the labor dispute by making reasonable efforts to limit those inducements and restraints which are inherent in common situs picketing to the primary employer, *so far as the common situs makes that practical.*

*Sharp & Tatro* at 386 (emphasis added).

The Board has clearly said that the *primary* object of area standards picketing, which is "not only lawful, but affirmatively protected under § 7 of the Act," is to communicate the area standards dispute to the public, and in particular those members of the public who purchase goods and services from and compete with the primary employer. *Giant Food Markets, Inc.*, 241 N.L.R.B. 727 (1979). *See also Polly Drummond Thriftway, Inc.*, 292 N.L.R.B. No. 44 (1989) (ALJ description of area standards picketing).[4] Therefore a reserved gate system is not properly established for the purposes of applying the *Moore Dry Dock* presumptions if it substantially impairs the effectiveness of the Union's protected area standards picketing by cutting off essentially all access to the relevant public. The fact that there is only one possible gate system obviously cannot alter this basic legal standard.

Our decision in *Pond* was based on the Board's precedents establishing this point. We said there:

> [A union's] refusal to confine its picketing to a back entrance hidden from virtually all public view does not by itself imply an unlawful intent to enmesh neutrals.... If [the neutral gate] constituted the *only* location at or near the job site at which the union could obtain reasonable public exposure, the neutral gate presumption could not accommodate the union's legitimate interests.

756 F.2d at 896 (emphasis added). There was no intimation in *Pond* that this principle would not apply to cases in which the neutral gate is also the only entrance practically available to the neutral employer and the choice of a primary gate is constrained by the needs of the primary employer.[5] Nor can such a novel construction

---

**4.** Indeed, the Union cannot use such picketing for purposes *other* than informing the public, such as to organize the non-unionized employees of the primary employer or to obtain recognition for the Union. *Giant Food Markets*. In this case the Union's lawful audience would presumably include other businesses or individuals in the area who might employ C.B. Construction and C.B.'s potential competitors in the area.

**5.** I note that even in this case, there was no evidence before the Board that it was *impossible* for the primary employer, C.B. Construction, to use the front entrance, only that it would have been very costly to the neutral employer, Vanderweil, to have C.B. use the front entrance and then carry its materials, etc., to the back elevator down a narrow corridor, use a crane, etc. Vanderweil testified: "If we had put in our contract that C.B. was to use the passenger elevator or use that [front] entrance, there's

be premised, as Judge Ginsburg tries to do, on a supposed "functional equivalence" between this common situs case and the wholly different case in which the Union seeks to picket at a secondary location from which the primary employer is totally absent. *See* Maj. op. at 320. A common situs case arises precisely because the Union is entitled to follow the primary employer to a secondary location where he is working; and the entire jurisprudence of reserved gate systems has arisen precisely to determine *when* the Union's pickets at this secondary location may be legitimately restricted to the particular entrance used by the primary employer. Judge Ginsburg's supposed "functional equivalence" would render this entire jurisprudence superfluous and evade our clear holding in *Pond:* the Union has a protected interest in communicating area standards disputes to the public and the Board must weigh this factor in determining whether any gate system has been *or can be* properly established.

absolutely no question in my mind that it would have had a substantial slowing down of the whole construction project and it would have escalated the cost to me substantially." J.A. 71. The same could be said of the gate system in *Pond* where a shift in the gates would have required the neutral employer, a private school, to reroute students, teachers, parents and visitors to a dead-end unmarked back entrance and reserve the main entrance on a busy street for a single contractor working on the campus.